Jonathan Shub (CSB # 237708)
Benjamin F. Johns (pro hac vice forthcoming)
Samantha E. Holbrook (pro hac vice forthcoming)
SHUB JOHNS & HOLBROOK LLP
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS RODRICK; ROBERT DADE; and JAMIE PABILONIA,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR NORTH AMERICA INC.; TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.; TOYOTA MOTOR SALES, U.S.A., INC.,<br><br>Defendants. | No. **'26CV3210 H    JLB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I.   INTRODUCTION

1.      Plaintiffs Francis Rodrick, Robert Dade, and Jamie Pabilonia (together, "Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Defendants Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Sales, U.S.A., Inc., (collectively, "Toyota"). All allegations made in this complaint are based on investigation of counsel and information and belief, except those allegations that pertain to Plaintiffs' vehicles, which are based on their personal knowledge.

2.      This putative class action arises from Toyota's failure to disclose and then adequately repair a uniform and widespread defect in the battery charging systems of model year 2022-2026 Lexus RX and Lexus NX vehicles (the "Class Vehicles") that causes the 12-volt batteries to repeatedly lose their charge.[1] This defect renders the Class Vehicles unable to start and drive, and also requires the premature replacement of their batteries.

3.      The result is that Plaintiffs and Class members are left with vehicles that are not fit for ordinary use: the batteries die without warning, potentially stranding their drivers and passengers. This defect—hereinafter referred to as the Battery Defect—also results in a considerable expenditure of time and out-of-pocket funds by Plaintiffs and Class members, who must jumpstart their vehicles or arrange for them to be towed, wait for dealerships to charge or replace batteries, purchase backup battery chargers and monitors, arrange separate transportation to school, work, medical appointments, and so on.

4.      While some Class members have had their 12-volt batteries replaced under warranty, Defendants have not remedied the Battery Defect, meaning that the replacement 12-volt batteries are similarly defective and will likely need to be replaced again. Many Class members have been through multiple 12-volt batteries in mere months and at 10,000 or fewer miles, even though 12-volt batteries ordinarily last several years and tens or hundreds of thousands of miles.

---

[1] Lexus is a division of the Toyota Motor Corporation, a vehicle manufacturer headquartered in Toyota, Japan. *See Who Manufactures Lexus*, LEXUS, https://www.lexusofalbuquerque.com/who-manufactures-lexus/ (last visited Apr. 6, 2026).

5. Had the true nature of the Battery Defect been made known to Plaintiffs and Class members at the time of purchase, they would not have purchased or leased the vehicles, or would have paid much less for them than they did.

## II. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

6. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more class members who are citizens of different states than Defendants.

7. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

### B. Personal Jurisdiction

8. This Court has general personal jurisdiction over Defendants because each of them conduct substantial business in this judicial district and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of California and throughout the United States.

9. There are numerous authorized Toyota dealerships in this District and throughout the state of California. Together, these authorized dealers sold a significant number of Class Vehicles.

10. While Toyota's primary places of business are in Texas and Kentucky, they conduct substantial operations in California. Toyota Motor North America, Inc. is a California corporation and has offices in Torrance, California. Toyota Motor Engineering & Manufacturing North America, Inc. operates Toyota Auto Body California, a manufacturing plant located in Long Beach, California. And Defendant Toyota Motor Sales, U.S.A., Inc., is a California corporation that conducts considerable business in California, as it markets, distributes, and oversees warranty service of the many thousands of Toyota vehicles that are sold, leased, and operated in California.

### C. Venue

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, and sold the affected vehicles in this District, and otherwise conducted extensive

business in this District. And as discussed below, Plaintiff Rodrick resides in San Diego, and purchased his Class Vehicle from an authorized Toyota dealer located in this judicial district.

**III.    PARTIES**

**A.    Plaintiffs**

**<u>Plaintiff Francis Rodrick</u>**

12.    Plaintiff Francis Rodrick is a resident of San Diego, California. Plaintiff Rodrick purchased a new 2024 Lexus RX350H vehicle at Lexus of El Cajon, an authorized dealership located in El Cajon, California.

13.    Plaintiff Rodrick purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the battery would properly function.

14.    Before purchasing the vehicle, Plaintiff Rodrick conducted research, which included reading literature on the Lexus website, engaging in discussions with the dealer sales representative, and reviewing other materials regarding the vehicle. Based on this, Plaintiff Rodrick believed the vehicle was safe and reliable. The safety and reliability of the vehicle were material reasons why Plaintiff Rodrick purchased the vehicle. At no point did Defendants or any of its agents or other representatives disclose the Defect to Plaintiff Rodrick the Defect.

15.    Plaintiff Rodrick's vehicle first exhibited signs of the Defect when it only had approximately 6,000 miles. Plaintiff Rodrick attempted to drive his vehicle, but because the battery was completely dead, the doors would not unlock. When he was able to enter his vehicle, it would not start. Plaintiff Rodrick took his vehicle to the dealership, where employees ran a diagnostic test but said the vehicle was fine.

16.    Despite this, Plaintiff Rodrick's vehicle's battery died the very next day. He took it back to the dealership, and they replaced the 345CCA conventional flooded battery with a larger 540CCA convential flooded battery. Neither battery ever charges past 80% capacity.

17.    Plaintiff Rodrick purchased a Bluetooth battery monitor at a cost of around $20. The device notifies him when the battery charge is too low, which occurs around every four days - after which he needs to charge his battery in order to drive his car.

18. Plaintiff Rodrick charges his battery with a Battery tender, which he purchased at a cost of about $100. He also purchased a lithium jump starter for around $100-150, which he keeps in his backseat in case of an emergency.

19. The fact that Plaintiff Rodrick has had to purchase and use three different devices in order to keep his car operating as it should is not normal and was not expected at the time of purchase.

20. Lexus dealership employees have not provided any more help to Plaintiff Rodrick. They told him that the issues with the battery occur because he does not drive his vehicle enough; however, the battery monitor on his vehicle clearly shows that the charging ceases after driving for only a few minutes, and that it only charges to around 80% capacity. Dealership employees are unable to explain why this happens.

21. Plaintiff Rodrick has suffered damages in the form of out-of-pocket costs of battery monitoring and charging devices, diminution in value of his vehicle, overpayment for the vehicle at the time of sale, personal time spent dealing with the Defect, and loss of use of his Vehicle.

22. Had Toyota disclosed the Defect to Plaintiff Rodrick and/or the public, Plaintiff Rodrick would not have purchased his vehicle, or would have paid significantly less for it than he did.

**Plaintiff Robert Dade**

1. Plaintiff Robert Dade is a resident of Lahaina, Hawaii. Plaintiff Dade paid over $75,000 to purchase a new 2024 Lexus RX 450+ at Servco Lexus Maui, an authorized dealership located in Maui, Hawaii.

2. The battery in Plaintiff Dade's vehicle first died in or around June 2024, when the vehicle had only around 1000 miles. Plaintiff managed to jumpstart the battery himself following this incident and then delivered his vehicle to the dealership for further inspection. The dealership did not assist with the Defect further. Plaintiff purchased a battery tender for approximately $30 from Costco to manage the battery health of his vehicle's battery.

3. Approximately a year later, the battery in Plaintiff Dade's vehicle died. He attempted to contact his Lexus dealership but did not receive a response. Plaintiff repeated the steps from the first incident to jumpstart his vehicle without driving his vehicle to the dealership.

4.     Throughout early 2026, Plaintiff Dade began experiencing charging complications with his vehicle's battery, limiting the battery's ability to fully charge.

5.     In April 2026, Plaintiff Dade discovered that his vehicle's battery died for the third time. Plaintiff jumpstarted his vehicle once again and contacted his dealership to schedule a service visit, currently scheduled for July 2026.

6.     Plaintiff Dade's vehicle has now died unexpectedly three times, requiring time spent on trips to the dealership.

7.     Plaintiff Dade has suffered increased anxiety, as well as losses in the form of diminution in value of his vehicle, personal time spent dealing with the Defect, and loss of use of his Vehicle for sometimes weeks at a time.

8.     Had Toyota disclosed the Defect to Plaintiff Dade and/or the public, he would not have purchased his vehicle or would have paid significantly less for it than he did.

**Plaintiff Jamie Pabilonia**

9.     Plaintiff Jamie Pabilonia is a resident of Manchester, Connecticut. Plaintiff Pabilonia paid over $75,000 to purchase a new 2023 Lexus RX 350h at Darcars Lexus of Englewood, an authorized dealership located in Englewood, New Jersey.

10.     The battery in Plaintiff Pabilonia's vehicle died on or around January 28, 2026, when the vehicle had approximately 36,510 miles. After contacting Lexus Roadside assistance to address the Defect, Lexus Roadside requested AAA to jumpstart the vehicle. While her vehicle's battery was jumpstarted, Plaintiff turned on her vehicle and received numerous warnings on her dashboard before the vehicle completely shut down again. Plaintiff once again contacted Lexus Roadside who had the vehicle towed to Plaintiff's dealership.

11.     At the dealership, Plaintiff Pabilonia was told that a component of her battery was fried during the attempt to jumpstart the vehicle's battery. The dealership indicated that the required part was on a national back order. AAA covered a majority of the expenses for the part and labor of the replacement, but Plaintiff was directly charged $143.24 for the remainder of the cost. Plaintiff's vehicle also required a battery replacement.

12.   Plaintiff's vehicle was kept at the dealership for over four weeks. Plaintiff was not offered a loaner vehicle, but was provided with a loaner after she requested one after a week without her own vehicle.

13.   Plaintiff Pabilonia's vehicle was equipped with a defective battery, which has unexpectedly died on one occasion so far, requiring Plaintiff to visit her dealership multiple times and depriving her of her car for multiple weeks.

14.   Plaintiff Pabilonia has suffered losses in the form of diminution in value of her vehicle, personal time spent dealing with the Defect, and loss of use of her Vehicle for sometimes weeks at a time.

15.   Had Toyota disclosed the Defect to Plaintiff Pabilonia and/or the public, she would not have purchased her vehicle, or would have paid significantly less for it than she did.

**B.    Defendants**

16.   Toyota Motor North America, Inc. ("TMNA") is a California corporation with its principal place of business located at 6565 Headquarters Drive, Plano, Texas. It has additional offices throughout the company, including in Torrance, California; Georgetown, Kentucky; Washington, D.C.; Ann Arbor, Michigan; New York, New York; and San Ramon, California. TMNA is a wholly owned subsidiary of Toyota Motor Corporation, a Japanese corporation. TMNA is the holding company for the North American operations of Toyota Motor Corporation and its other corporate affiliates and subsidiaries. TMNA's activities include advertising, marketing, distributing, leasing, warranting, and servicing Lexus vehicles through Toyota's approximately 1,800 dealerships throughout the United States.

17.   Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is a Kentucky corporation with its principal place of business located at 6565 Headquarters Drive, Plano, Texas. Like TMNA, it is a wholly-owned subsidiary of Toyota Motor Corporation. In addition to Texas, it also has major operations in Arizona, California, and Michigan. TEMA provides support to Toyota's North American manufacturing plants in areas including purchasing, production control, production engineering, quality control, and administration. It shares responsibility for Toyota's engineering, design, research and development, and manufacturing activities with Toyota's fourteen manufacturing plants in North America.

18.    Toyota Motor Sales, U.S.A., Inc. ("TMS") is a California corporation with its primary place of business located at 6565 Headquarters Drive, Plano, Texas. From its founding in 1957 until 2017, its principal place of business was located in Torrance, California. It is a wholly owned subsidiary of Toyota Motor Corporation and engages in the marketing, sales, and distribution of Lexus cars through Toyota's approximately 1,800 authorized dealers throughout the United States.

**IV.    FACTUAL ALLEGATIONS**

**A.    Development and Production of the Class Vehicles**

19.    The Lexus RX is a "luxury crossover vehicle" and a "core model to Lexus."[2] The fifth generation of the Lexus RX was released in 2022.[3] Defendant TMS owns and is responsible for the Lexus brand.[4]

20.    Between its American debut in 1998 and fifth generation release in 2022, Toyota sold approximately 3.5 million Lexus RX vehicles across 94 countries.[5]

21.    Toyota released its first Lexus RX model in 1998[6] and debuted the fifth generation, the 2023 Lexus RX, in 2022.[7] Since the release of the 2023 Lexus RX, Lexus has consistently released new RX models each year.

22.    Toyota released its first Lexus NX model in late 2014 as a 2015 model-year vehicle. The Lexus NX is a compact vehicle, smaller than the RX in all major dimensions, and slightly less expensive. The second generation was released in 2022, featuring a complete redesign and adding new technology and powertrains. The Lexus NX has been produced every year since its 2015 model-year debut.

---

[2] *World Premiere of the All-New Lexus RX*, LEXUS (June 1, 2022), https://global.toyota/en/newsroom/lexus/37367383.html.

[3] *Id.*

[4] *Who Manufactures Lexus?*, LEXUS, https://www.lexusofalbuquerque.com/who-manufactures-lexus/#:~:text=Yes%2C%20the%20Lexus%20brand%20is%20owned%20by,of%20quality%20parts%20and%20vehicles%20takes%20place (last visited Apr. 7, 2026).

[5] *Id.*

[6] *Looking Back: The Evolution of the Lexus RX*, LEXUS (Dec. 6, 2022), https://pressroom.lexus.com/looking-back-the-evolution-of-the-lexus-rx/.

[7] *Id.*

**B.      The Battery Defect**

23.      The 12-volt battery in the Class Vehicles operates accessories like windshield wipers, lights, powered windows and seats, heating and cooling fans, and the radio. The 12-volt battery is also necessary to start the motor. If the 12-volt battery does not have an adequate charge, the Class Vehicles will not start.

24.      The 12-volt batteries are recharged by driving the Class Vehicles. However, the 12-volt charging and battery systems in the Class Vehicles are defective and, as a result, the 12-volt batteries: (i) are not adequately recharged while driving; and (ii) rapidly drain until empty prematurely when the vehicle is not in operation.

25.      Consumers report that their Class Vehicles' 12-volt batteries drain in as quickly as a few weeks, even on days with little to no driving.

26.      Toyota itself, in its Technical Service Bulletin ("TSB") No. L-SB-0016-23[8], pertaining to a number of 2024 Lexus vehicles mentions the dangers of so-called "parasitic drain" (wherein a vehicle's 12-volt battery drains when the car is seemingly otherwise not in use), noting that certain conditions like parasitic draw "can reduce [the battery's] performance and service life."

27.      In another service bulletin pertaining to 2024 Lexus vehicles, TSB No. L-SB-0015-23, Toyota again mentioned that a "parasitic current" could reduce the battery's charge.[9]

28.      These TSBs do not stop at the 2024 RX models. TSB No. L-SB-0001-24 mentions that "parasitic drain" can cause a reduction in performance and service life for 2025 Lexus vehicles.[10]

29.      The Battery Defect has four deleterious effects:

          A.      First, the 12-volt batteries often lack sufficient charge to start the vehicle when needed, rendering the Class Vehicles inoperable, unexpectedly standing drivers

---

[8] *Battery Maintenance During PDS*, LEXUS (Mar. 13, 2023), https://static.nhtsa.gov/odi/tsbs/2024/MC-10248820-9999.pdf.

[9] *Maintenance for HV/BEV and Auxiliary Batteries*, LEXUS (March 13, 2023), https://static.nhtsa.gov/odi/tsbs/2023/MC-10244125-9999.pdf.

[10] *Battery Inspection and Maintenance During PDS*, LEXUS (Jan. 24, 2024), https://static.nhtsa.gov/odi/tsbs/2025/MC-11014201-0001.pdf.

and passengers, which can lead to unsafe circumstances and the added expense of towing services.

B.  The second problem is that because the 12-volt batteries operate many of the accessory systems in the Class Vehicles—including the computer systems required to manage the drive motors—the Class Vehicles may shut down suddenly, even while driving, when the 12-volt battery is discharged. This presents an unreasonable safety risk for drivers, passengers, and the general public.

C.  The third problem is that repeated cycles of inadequate charging ultimately destroy the 12-volt batteries, requiring their premature replacement. Ultimately, fully discharging a 12-volt lead-acid battery causes the lead-acid medium to crystallize, such that it can no longer hold a charge. As noted above, 12-volt batteries typically have an expected useful life of several years and hundreds or thousands of charge cycles over tens or hundreds of thousands of miles. The Battery Defect shortens that useful life.

30.  When the 12-volt batteries unexpectedly die, an individual may be prone to jump-starting the vehicle so they can start the vehicle.  However, jump-starting requires carrying the proper equipment, may require the presence of another vehicle, and can itself damage the 12-volt battery.

31.  To Plaintiffs' knowledge, Toyota has never offered any permanent or effective fix to the Battery Defect. Toyota also failed to disclose this material information at the time of purchase and has concealed it, or at least failed to disclose it, at any point thereafter.

32.  At best, dealers may replace failed 12-volt batteries under warranty, but without a permanent repair for the defective battery, those batteries will inevitably fail prematurely again. That is not a tenable solution. As discussed below, Plaintiffs have experienced numerous battery failures and have had to prematurely replace their 12-volt batteries.

**C.    Defendants Knew About the Battery Defect**

33.  Toyota is aware of the Battery Defect. It learned of the Battery Defect through the TSBs discussed above, and via pre-release testing. Defendants' pre-sale testing of the Class Vehicles would have necessary revealed the Battery Defect to them.

34.     Toyota's knowledge of the Battery Defect is also confirmed by numerous consumer complaints about the issue. Instances of the battery failures are widespread, and Defendants are aware of them, not only because Plaintiffs and Class members brought them to Defendants' attention by bringing their vehicles to Defendants' authorized dealers but also because of the many complaints lodged by consumers with the National Highway Transportation Safety Agency ("NHTSA"), with Defendants directly, and in online fora that Defendants, on information and belief, monitor.

35.     NHTSA maintains a database of motor-vehicle consumer complaints submitted since January 2000. Consumers are able to submit complaints online or by phone in which they provide information that includes the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, and a description of the incident. Defendants have an obligation to monitor the NHTSA database to identify potential defects in its vehicles, pursuant to the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000)

36.     Below are examples and excerpts from NHTSA, various online forums, and a news article that illustrate consumers' experiences with the Battery Defect in the Lexus RX and Lexus NX:

NHTSA ID Number: 11711016

Incident Date:  January 5, 2026

Consumer Location: PEACHTREE CORNERS, GA

The 2023 Lexus RX-350 has had complete 12 volt battery failure twice in the last year. The hybrid battery charging procedure for the 12 volt battery is insufficient. Twice I have been stranded. The frequency and duration of the hybrid battery charging is not sufficient. A more powerful 12 volt AGM battery is needed. The dealer says I am not taking sufficiently long trips to charge the battery. Last Saturday I took two 30 - 40 minute trips but the battery had only 11.8 volts requiring a 100% charge. There should be a recall to fix this problem.

NHTSA ID NUMBER: 11710076

Incident Date: January 8, 2026

Consumer Location: GAITHERSBURG, MD

If we don't drive the car for 4 or 5 days, especially in cold weather, the car will sometimes not start due to a drained 12V battery. We've spoken to Lexus of Rockville, MD and Lexus roadside assistance, who are aware of the issue but say the 12V battery is "healthy." Online research shows this is a widespread known issue with Lexus RX350h and RX500h vehicles from 2023 onward: [XXX] [XXX] . A simple software update to ensure that the high-voltage hybrid battery charges the 12V battery to a greater extent when the vehicle is parked should solve the problem, but Lexus has so far not addressed this problem. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

NHTSA ID NUMBER: 11708193

Incident Date: September 14, 2024

Consumer Location: LOS ALTOS, CA

The car started showing multiple error messages on the dash and then shut off while in operation, it would not restart without a service call and battery boost. This has happened multiple times. Online research shows this is a common issue with the hybrid models - the 12v battery doesn't get adequately charged, voltage drops and car ceases to work - even while mid drive on the road, this is extremely scary and dangerous.

NHTSA ID NUMBER: 11708068

Incident Date: January 8, 2025

Consumer Location: CINCINNATI, OH

Battery has "sulfated" twice in 15 months of ownership. Lexus/dealer have replaced battery two times. Considered safety issue since battery could "die" at any time. Could be locked out of car with infant inside or if battery dies while driving, car could become immobile.

NHTSA ID NUMBER: 11671336

Incident Date: December 18, 2024

Consumer Location: LEWES, DE

Brand new vehicle- 12volt battery failed after 5 weeks. Lexus initially stated battery fine. Then battery failed while in their possession- Lexus replaced battery. Few weeks later battery failed again. Lexus tested & replaced battery for second time - but battery kept draining & they were unable to repair after having vehicle at dealership for 3.5 months

NHTSA ID NUMBER: 11667000

Incident Date: June 14, 2025

Consumer Location: ALTOONA, FL

This car is a hybrid. it is 15mos. old w/13500 miles. I've had two 12v battery failures which resulted in 1 time being locked out of car, and 1 time locked in.

NHTSA ID NUMBER: 11648649

Incident Date: March 16, 2025

Consumer Location: TRYON, NC

The vehicle would not start. It is a known problem with this PHEV that if car is not used for a couple of days the 12v battery becomes depleted and the car cannot be started and all systems of the car are dead.

NHTSA ID NUMBER: 11648610

Incident Date: March 8, 2025

Consumer Location: GRAYSLAKE, IL

The vehicle was locked, parked in garage. 12V battery failed. Vehicle became a brick. Vehicle had to be towed to dealership. Battery changed under warranty.

Complaint from a 2024 Lexus RX 350h driver, May 27, 2025[11]

---

[11] Hjacobs911, LEXUS OWNERS RX (May 27, 2025), https://www.lexusrxowners.com/threads/battery-issues.350/.

- 13 -

Well my 2024 Rx350h left me stranded at a beach campsite in Oregon (I live in Calif.). Anyway AAA would not jump it. Towed to a Toyota dealership (Lexas [sic] 300 miles away) renting a hotel room waiting to hear news tomorrow morning. May need to have it towed another 100 miles to Lexus. Lexus would not tow to dealership. Saying you only get 35 miles. Wish me luck. Not to happy!!!

Complaint from a Lexus RX350 driver, May 10, 2024[12]

Purchased RX new in March 2023, it's our second car and not a regular driver. After sitting for a month battery went dead. When we went to start car all doors locked with driver inside. All electrical dead. Had to crawl out trunk. Dealer towed to shop and we were told battery was fine and needed to drive every week or get a battery buddy and keep plugged in when not driving. That made no sense to me but we tried drive more. We followed their Instructions and drove every week but battery went dead again. on the third time we told dealer to keep the RX till they had it fixed while I went BMW shopping. In a week the dealer called and had problem solved and had replaced battery. Claimed it was a fault deep in battery and hard to detect. Driven now for four months and no issues. Worse part is dealership acted like they didn't believe our problem was real until a salesman had same happen to him in our RX. If you have electrical issues with your Lexus RX make them replace your battery first!

Complaint from a 2023 Lexus RX 350 driver, May 24, 2025[13]

I have 2023 Lexus RX 350 3000 kms (1800 miles). When the vehicle is not driven for 3 or 4 days during cold weather the battery dies. The dealership claims this happens because The vehicle is not driven enough. The first battery replacement they covered by warranty with no problem. For the second battery replacement they claimed no warranty coverage since the problem was caused

---

[12] tdhalvorson, LEXUS OWNERS RX (May 10, 2024), https://www.lexusrxowners.com/threads/lexus-2023-rx-battery-issues.237/.

[13] Swaggy, LEXUS OWNERS RX (May 24, 2025), https://www.lexusrxowners.com/threads/lexus-2023-rx-battery-issues.237/.

by not driving enough. I challenged their claim and they eventually covered under warranty. When battery problem occurs a warning light appeared "shift system malfunction". I don't believe they know how to resolve this problem.

Complaint from a Lexus RX 350h driver, February 24, 2026[14]

My RX350H brand new from Lexus since May 2023. So far, the battery dead for the 3rd times in about 30 months. 3 new batteries were replaced. My friend who had the same model and had also replaced 3 new batteries. Not sure the warranty period of the battery. Is warranty lasts for 8 years? Not sure how much I have to pay for replacing the new battery after the warranty period, not to mention the trouble I will encounter when I park outside home.

Complaint from a 2025 Lexus RX 350h driver[15]

This is great work OP. Put me on the list of Lexus 2025 RX 350h owners looking for a solution to the battery drain issue on their hybrids. My 12V battery is toast after only 12 months of ownership.

I'm hoping Lexus changes their garbage charging software to fix the issue, but I think I have to give your solution a shot.

Complaint from a 2024 Lexus RX 350h driver, March 30, 2026[16]

I went overseas for 30 days, and when I got back, the battery on my 2024 RX350h was dead. The battery is located under the trunk, and I couldn't open the trunk without power. Lexus Roadside Assistance came out and jump-started the car. The technician recommended that I buy a NOCO

---

[14] Tango9, LEXUS OWNERS RX (Feb. 24, 2026), https://www.lexusrxowners.com/threads/lexus-2023-rx-battery-issues.237/.

[15] bomby0, REDDIT, https://www.reddit.com/r/Lexus/comments/1npkob4/toyotalexus_hybrid_12v_battery_failures_analysis/.

[16] TexasLexusHybrid, FACEBOOK (Mar. 30, 2026, at 10:39 EST), https://www.facebook.com/groups/546963663229841/?multi_permalinks=1614380076488189&hoisted_section_header_type=recently_seen.

Genius 1 charger from Amazon (about $30) and keep it plugged into AC power next time I travel. I also took the car to the dealership to have the battery and starter tested, and they ended up replacing the battery.

Has anyone else had their battery die on a 1.5-year-old car?

Complaint from a 2024 Lexus RX 350h driver, September 3, 2025[17]

Recently bought a 2024 demonstrator RX350h from a dealer and I really like it. Great car. There are some little things I might comment about but seriously,… nothing major. What DID need a comment though was the fact that the 12v battery died completely after only 14 months and everything shut down and I got locked out of the car. Roadside assist came and changed the battery and we're off again. Has anyone experienced this early battery failure? Is it common?

Complaint from a 2024 Lexus RX 350F driver, May, 2025[18]

Our 2024 RX 350F sport has had dead battery issues at least 6 times. We only have 4500 miles on it. Something is draining the battery and we can't seem to isolate it. Dealership has tested the battery and charging systems 3 times and state everything is fine. Drove the car a few days ago 80 miles and the day after battery was dead again. Something is draining this battery and we can't figure out what it is. Any help, suggestions appreciated! Seems crazy to spend over 60k on a new vehicle to have this happen! This is our second RX and wish we never traded our 2015 which never had a battery die!

News Article about TikTok from @lexusrx500__, October 10, 2024[19]

---

[17] Bruce Bedwell, FACEOOK (Sept. 3, 2025), https://www.facebook.com/groups/298564897176011/posts/2513248425707636/.

[18] Lopeka, CLUB LEXUS (May 2025), https://www.clublexus.com/forums/rx-5th-gen-2023-present/1040032-2024-rx-f-sport-battery-problems.html.

[19] Mustafa Gatollari, *'After 2 Weeks of Ownership': Lexus Customer Says His 2024 RX 350 'Died Randomly,'* DAILY DOT (Oct. 10, 2024, at 14:00 CDT), https://www.solterraforum.com/threads/5-months-and-dead-battery.1960/.

This is our second brand new Lexus in the past year and a half that has died randomly. Both have been determined to have defective 12v batteries from the factory.

37. Despite knowing about these problems with the 12-volte batteries, Defendants continued to include the defective batteries in the Class Vehicles and continued to sell and lease these vehicles without eliminating the Battery Defect and without disclosing it to Plaintiffs and Class members in warranty manuals, on Defendants' websites, in advertisements, on Monroney stickers, or elsewhere.

## V.   CLASS ACTION ALLEGATIONS

38. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Nationwide Class"), defined as:

Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

39. In addition to the Nationwide Class, Plaintiffs also seek to represent the each of the following state subclasses as defined below:

**California Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the State of California.

**New Jersey Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the State of New Jersey.

**Hawaii Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the State of Hawaii.

40. The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

41. **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class members, since such information is in the exclusive control of Defendants. Nevertheless, the Class encompasses tens of thousands of individuals dispersed throughout the United States. The number of Class members is so numerous that joinder of all Class members is impracticable. The names, addresses, and phone numbers of Class members are identifiable through documents maintained by Defendants.

- 17 -

42. **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class members. These common questions include:

i. whether the Class Vehicles are Defective;

ii. whether Defendants had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii. when Defendants became aware of the existence of the Battery Defect in the Class Vehicles;

iv. whether Defendants knowingly failed to disclose the existence and cause of the Battery Defect in the Class Vehicles;

v. whether Defendants knowingly concealed the Battery Defect in the Class Vehicles;

vi. whether Defendants' conduct as alleged herein violates consumer protection laws;

vii. whether Defendants' conduct as alleged herein violates warranty laws;

viii. whether the Class Vehicles are unmerchantable;

ix. whether Defendants' conduct as alleged herein violates other laws asserted herein;

x. whether Plaintiffs and Class members overpaid for their Class Vehicles as a result of the defect;

xi. whether Plaintiffs and Class members have suffered an ascertainable loss as a result of the defect; and

xii. whether Plaintiffs and Class members are entitled to damages and equitable relief.

43. **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because all Class members were comparably injured through Defendants' substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class members arise from the same operative facts and are based on the same legal theories.

44. **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained

counsel competent and experienced in automobile class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiffs and their counsel.

45.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## VI.    ANY APPLICABLE STATUES OF LIMITATION ARE TOLLED

### A.    Discovery Rule

46.    Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that the Class Vehicles had one or more design and/or manufacturing defects that caused the Class Vehicle batteries to lose charge and/or require premature replacement.

47.    Plaintiffs and Class members had no realistic ability to discover the extent of the design and/or manufacturing defects until their Class Vehicles' 12-volt batteries suddenly died, potentially leaving them stranded, and requiring jump-starting, towing, and/or battery replacement. Plaintiffs and Class members would have had no reason to individually believe that the problems with their Vehicles were the result of a widespread design and/or manufacturing defect. Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

### B.    Equitable Estoppel

48.    Defendants are equitably estopped from asserting the statutes of limitations. Defendants misrepresented that the Class Vehicles were safe and free from defects. Defendants knew that the Class

Vehicles were unsafe and unable to perform as advertised without risking battery failures. Plaintiffs and Class members, by contrast, were unaware of the true nature of the Class Vehicles and relied upon Defendants' misrepresentations and omissions. Plaintiffs and Class members will be prejudiced if Defendants are not estopped.

## VII.   CAUSES OF ACTION

### COUNT I

**FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT**
**Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclass**

49.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

50.     Plaintiffs assert this claim on behalf of themselves and the Nationwide Class and State Subclasses against Defendants.

51.     The Class Vehicles that Plaintiffs and Class members purchased or leased were defective because the charging system inadequately charges the 12-volt batteries, leading to sudden and premature battery failures.

52.     Defendants failed to disclose the Battery Defect and acted with reckless disregard for the truth when they failed to disclose that the Battery Defect would render the Class Vehicles prone to sudden and premature battery failures.

53.     Defendants had a duty to disclose this material information to Plaintiffs and Class members because Defendants were in a superior position to know about the existence, nature, cause, and results of the Battery Defect; Plaintiffs and Class members could not reasonably have been expected to learn or discover the Battery Defect; and Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn about or discover the Battery Defect.

54.     Plaintiffs and Class members did not know about the Battery Defect and could not have discovered it through reasonably diligent investigation.

55.     But for Defendants' fraudulent omissions of material information, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs and Class members have sustained damage because they purchased or leased Vehicles that were

not as represented. Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles.

56. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class members, and for Defendants to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, that amount shall be determined according to proof at trial.

**COUNT II**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**Plaintiffs Individually and on Behalf of the Nationwide Class and the State Subclasses**

57. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

58. Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

59. The Class Vehicles are "goods" as defined under the UCC.

60. A warranty that the Class Vehicles were in merchantable quality and condition is implied by law in transactions for the purchase and lease of the Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

61. The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used, and fall short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the charging system inadequately charges the 12-volt batteries, leading to sudden and premature battery failures. The Battery Defect renders the Class Vehicles unmerchantable.

62. Defendants were provided notice of the issues complained of herein by numerous complaints it received about them.

63. Plaintiff and the other Class members have had sufficient direct dealings with either Defendants or its agents to establish privity of contract between Defendants on one hand, and Plaintiff

and each of the Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class members are intended third-party beneficiaries of contracts between Defendants and its dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

64.     As a direct and proximate result of the breach of said warranties, Plaintiff and Class members were injured, and are entitled to damages.

## COUNT III

**UNJUST ENRICHMENT**
**In the Alternative to All Other Claims**
**Plaintiff Individually and on Behalf of the Nationwide Class and State Subclasses**

65.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

66.     All Plaintiffs bring this claim individually and on behalf of the Nationwide Class and State Subclasses.

67.     This claim is pleaded in the alternative to the other claims set forth herein.

68.     As the intended and expected result of its conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of Class Vehicles that contain the Battery Defect.

69.     In particular, the value of the Class Vehicles was artificially inflated by Defendants' concealment of the Battery Defect, and Plaintiff and Class Members overpaid for the cars and have been forced to pay other costs.

70.     As a result of its wrongful acts, concealments, and omissions of the Battery Defect in its Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiff and Class Members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

71.     Moreover, Defendants continue to profit from its ongoing wrongful behavior by denying the nature and existence of the Battery Defect to Plaintiff and Class Members during the duration of the

Warranties, refusing to honor the Warranties, and selling replacement parts to Plaintiff and the Class Members.

72. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiff and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiff and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

73. Plaintiff and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

74. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and monies from Plaintiff and Class Members rightfully belonging to them.

75. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from its wrongful conduct.

76. As a result of the Defendants' unjust enrichment, Plaintiff and Class Members have suffered damages.

77. Additionally, Plaintiff seeks injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiff also seeks injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT IV

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 ("UCL")
### (On behalf of Plaintiffs Rodrick and the California Class)

78. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

79. Plaintiffs Rodrick bring this claim on behalf of himself and on behalf of the members of the California Class against Defendants.

80. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

81. Defendants have engaged in unfair competition and unfair, unlawful, or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing the Defect from Plaintiff Rodrick and other California Class Members. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiff Rodrick and California Class Members could not have been reasonably expected to learn or discover these true facts.

82. The Defect constitutes a safety issue for automobile owners, drivers, and passengers, thus requiring Defendants to disclose its existence to past and future owners and lessees.

83. By its acts and practices, Defendants have deceived Plaintiff Rodrick and are likely to have deceived the public. In failing to disclose the Defect and suppressing other material facts, Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff Rodrick and the California Class Members. Defendants' omissions and acts of concealment pertained to information material to Plaintiff Rodrick and other California Class Members, as it would have been to all reasonable consumers.

84.     The injuries Plaintiff Rodrick and the California Class Members suffered outweigh any potential countervailing benefit to consumers or to competition, and they are not injuries that Plaintiff Rodrick and the California Class Members could or should have reasonably avoided.

85.     Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

86.     Plaintiff Rodrick seek to enjoin Defendants from further unlawful, unfair, and/or fraudulent acts or practices, to obtain restitutionary disgorgement of all monies and revenues Defendants have generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT V

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code § 17500, *et seq.*
### (On behalf of Plaintiff Rodrick and the California Class)

87.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

88.     Plaintiff Rodrick bring this claim on behalf of themselves and on behalf of the members of the California Class against Defendants.

89.     California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

90.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care Defendants should have known to be untrue and misleading to consumers, including Plaintiff Rodrick and other California Class Members.

91.    Defendants violated Section 17500 because their misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles were material and likely to deceive a reasonable consumer.

92.    Plaintiff Rodrick and the other California Class Members have suffered injuries in fact, including the loss of money or property, resulting from Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiff Rodrick and the other California Class Members relied on Defendants' misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. Defendants' representations were untrue because they distributed the Class Vehicles with the Defect. Had Plaintiff Rodrick and the other California Class Members known this, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, Plaintiff Rodrick and the California Class Members did not receive the benefit of their bargain.

93.    All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

94.    Plaintiff Rodrick, individually and on behalf of the other California Class Members, requests that the Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, and restore to Plaintiff Rodrick and the other California Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

# COUNT VI

**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")**
**(On behalf of Plaintiff Pabilonia and the New Jersey Class)**

95.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

96.     Plaintiff Pabilonia brings this claim on behalf of herself and on behalf of the New Jersey Class against Defendants.

97.     Defendants are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

98.     The Class Vehicles are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

99.     Defendants violated the NJCFA by engaging in the practices described above, and by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles.

100.     Defendants had the duty to Plaintiff Pabilonia and New Jersey Class Members to disclose the Defect and the defective nature of the Class Vehicles and to refrain from unfair or deceptive practices under the NJCFA because (a) Defendants were in a superior position to know the true state of facts about the Defect and its associated costs; (b) Plaintiff Pabilonia and New Jersey Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest; and (c) Defendants knew that Plaintiff Pabilonia and New Jersey Class Members could not reasonably have been expected to learn about or discover the Defect and the effect it would have on the Class Vehicles' operability.

101.     In failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty to disclose.

102.     By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose the Defect and the defective nature of the Class Vehicles, Defendants engaged in one or more of the following

unfair or deceptive business practices prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

103. The facts Defendants concealed or did not disclose to Plaintiff Pabilonia and New Jersey Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Pabilonia and New Jersey Class members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

104. Plaintiff Pabilonia and New Jersey Class Members suffered ascertainable losses and actual damages through their overpayment at the time of purchase and lease for Class Vehicles with an undisclosed Defect as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

105. Defendants' violations present a continuing risk to Plaintiff Pabilonia and New Jersey Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

106. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiff Pabilonia and New Jersey Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the NJCFA.

## COUNT VII

**VIOLATION OF HAWAII UNFAIR OR DECEPTIVE ACTS AND PRACTICES STATUTE
HRS § 480-1, *et seq.* ("UDAP")
(On behalf of Plaintiff Dade and the Hawaii Class)**

107. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

108. Plaintiff Dade brings this claim on behalf of himself and on behalf of the Hawaii Class against Defendants.

109. Defendants are "persons" within the meaning of HRS § 480-1.

110. The Class Vehicles are "commodities" within the meaning of HRS § 480-1.

111. Defendants violated the UDAP by engaging in the practices described above, and by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles.

112. Defendants had the duty to Plaintiff Dade and Hawaii Class Members to disclose the Defect and the defective nature of the Class Vehicles and to refrain from unfair or deceptive practices under the UDAP because (a) Defendants were in a superior position to know the true state of facts about the Defect and its associated costs; (b) Plaintiff Dade and Hawaii Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest; and (c) Defendants knew that Plaintiff Dade and Hawaii Class Members could not reasonably have been expected to learn about or discover the Defect and the effect it would have on the Class Vehicles' operability.

113. In failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty to disclose.

114. By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose the Defect and the defective nature of the Class Vehicles, Defendants engaged in the exact type of unfair or deceptive acts and practices prohibited by HRS § 480-2 because they used deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

115. The facts Defendants concealed or did not disclose to Plaintiff Dade and Hawaii Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Dade and Hawaii Class members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

116. Plaintiff Dade and Hawaii Class Members suffered ascertainable losses and actual damages through their overpayment at the time of purchase and lease for Class Vehicles with an undisclosed Defect as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

117. Defendants' violations present a continuing risk to Plaintiff Dade and Hawaii Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

118. Pursuant to HRS § 480-13, Plaintiff Dade and Hawaii Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the UDAP.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and each of the Subclasses, pray that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B. Appoint Plaintiffs as representatives of the Nationwide Class and/or the applicable State Classes and their counsel as Class Counsel;

C. Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class members are entitled;

D.    Award pre- and post-judgment interest on any monetary relief;

E.    Grant appropriate injunctive relief against all Defendants, including an order requiring Defendants to permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.    Determine that Defendants are financially responsible for all Class notice and administration of Class relief;

G.    Award reasonable attorney fees and costs; and

H.    Grant such further relief that this Court deems appropriate.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED this 22ND DAY OF MAY, 2026.

By: */s/ Jonathan Shub*

Jonathan Shub (CSB # 237708)
Benjamin F. Johns (*pro hac vice forthcoming*)
Samantha E. Holbrook (*pro hac vice forthcoming*)
Deirdre R. Mulligan (*pro hac vice forthcoming*)
**SHUB JOHNS & HOLBROOK LLP**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com
dmulligan@shublawyers.com

E. Powell Miller
Dennis A. Lienhardt
Dana E. Fraser
**THE MILLER LAW FIRM P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

*Counsel for Plaintiffs*