Gayle M. Blatt (SBN # 122048)
P. Camille Guerra (SBN # 326546)
**CASEY GERRY FRANCAVILLA BLATT LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
gmb@cglaw.com
camille@cglaw.com

*Counsel for Plaintiffs and the Proposed Class*

[Additional counsel listed on signature page]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

FRANCIS RODRICK, ROBERT DADE, JAMIE PABILONIA, DEBRA AKEL, VINCENT SICA, DANIEL MCRAE, CATHERINE DOYLE, MARTHA SAMUEL, and HOWARD WERSTIL,

Plaintiffs,

v.

TOYOTA MOTOR NORTH AMERICA INC.; TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.; TOYOTA MOTOR SALES, U.S.A., INC.,

Defendants.

Case No. 3:26-cv-03210-H-JLB

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## I. INTRODUCTION

1. Plaintiffs Francis Rodrick, Robert Dade, Jamie Pabilonia, Debra Akel, Vincent Sica, Daniel McRae, Catherine Doyle, Martha Samuel, and Howard Werstil (together, "Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Defendants Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Sales, U.S.A., Inc., (collectively, "Toyota"). All allegations made in this complaint are based on investigation of counsel and information and belief, except those allegations that pertain to Plaintiffs' vehicles, which are based on their personal knowledge.

2. This putative class action arises from Toyota's failure to disclose and then adequately repair a uniform and widespread defect in the battery charging systems of model year 2022-2026 Lexus RX and Lexus NX vehicles and model year 2023-2026 Lexus RZ vehicles (the "Class Vehicles") that causes the 12-volt batteries to repeatedly lose their charge.[1] This defect renders the Class Vehicles unable to start and drive, and also requires the premature replacement of their batteries.

3. The result is that Plaintiffs and Class members are left with vehicles that are not fit for ordinary use: the batteries die without warning, potentially stranding their drivers and passengers. This defect—hereinafter referred to as the Battery Defect—also results in a considerable expenditure of time and out-of-pocket funds by Plaintiffs and Class members, who must jumpstart their vehicles or arrange for them to be towed, wait

[1] Lexus is a division of the Toyota Motor Corporation, a vehicle manufacturer headquartered in Toyota, Japan. *See Who Manufactures Lexus*, LEXUS, https://www.lexusofalbuquerque.com/who-manufactures-lexus/ (last visited Apr. 6, 2026).

for dealerships to charge or replace batteries, purchase backup battery chargers and monitors, arrange separate transportation to school, work, medical appointments, and so on.

4. While some Class members have had their 12-volt batteries replaced under warranty, Defendants have not remedied the Battery Defect, meaning that the replacement 12-volt batteries are similarly defective and will likely need to be replaced again. Many Class members have been through multiple 12-volt batteries in mere months and at 10,000 or fewer miles, even though 12-volt batteries ordinarily last several years and tens or hundreds of thousands of miles.

5. Had the true nature of the Battery Defect been made known to Plaintiffs and Class members at the time of purchase, they would not have purchased or leased the vehicles, or would have paid much less for them than they did.

## II. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

6. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more class members who are citizens of different states than Defendants.

7. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**B. Personal Jurisdiction**

9. This Court has general personal jurisdiction over Defendants because each of them conduct substantial business in this judicial district and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of California and throughout the United States.

10. There are numerous authorized Toyota dealerships in this District and throughout the state of California. Together, these authorized dealers sold a significant number of Class Vehicles.

11. While Toyota's primary places of business are in Texas and Kentucky, they conduct substantial operations in California. Toyota Motor North America, Inc. is a California corporation and has offices in Torrance, California. Toyota Motor Engineering & Manufacturing North America, Inc. operates Toyota Auto Body California, a manufacturing plant located in Long Beach, California. And Defendant Toyota Motor Sales, U.S.A., Inc., is a California corporation that conducts considerable business in California, as it markets, distributes, and oversees warranty service of the many thousands of Toyota vehicles that are sold, leased, and operated in California.

**C. Venue**

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, and sold the affected vehicles in this District, and otherwise conducted extensive business in this District. And as discussed below, Plaintiff Rodrick resides in San Diego, and purchased his Class Vehicle from an authorized Toyota dealer located in this judicial district.

## III. PARTIES

### A. Plaintiffs

**<u>Plaintiff Francis Rodrick</u>**

13. Plaintiff Francis Rodrick is a resident of San Diego, California. On or around February 14, 2024, Plaintiff Rodrick purchased a new 2024 Lexus RX350H vehicle at Lexus of El Cajon, an authorized dealership located in El Cajon, California.

14. Plaintiff Rodrick purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the battery would properly function.

15. Before purchasing the vehicle, Plaintiff Rodrick conducted research, which included reading literature on the Lexus website, engaging in discussions with the dealer sales representative, and reviewing other materials regarding the vehicle. Based on this, Plaintiff Rodrick believed the vehicle was safe and reliable. The safety and reliability of the vehicle were material reasons why Plaintiff Rodrick purchased the vehicle. At no point did Defendants or any of its agents or other representatives disclose the Defect to Plaintiff Rodrick the Defect.

16. Plaintiff Rodrick's vehicle first exhibited signs of the Defect in or around March 2025, when it only had approximately 6,000 miles on it. Plaintiff Rodrick attempted to drive his vehicle, but because the battery was completely dead, the doors would not unlock. Plaintiff needed to jumpstart his veihlce in order to unlock it. When he was able to enter his vehicle, Plaintiff Rodrick took his vehicle to Lexus of San Diego, another authorized Lexus dealership, where employees ran a diagnostic test. Lexus Service representatives told Plaintiff Rodrick that the vehicle was fine.

17. Despite this, Plaintiff Rodrick's vehicle's battery died the very next day. He took it back to the dealership, and they replaced the 345CCA conventional flooded battery

with a larger 540CCA convential flooded battery. Neither battery ever charges past 80% capacity.

18. As a result of these events, Plaintiff Rodrick purchased a Bluetooth battery monitor at a cost of around $20. The device notifies him when the battery charge is too low, which occurs around every four days - after which he needs to charge his battery in order to drive his car.

19. Plaintiff Rodrick charges his battery with a Battery tender, which he purchased at a cost of about $100. He also purchased a lithium jump starter for around $100-150, which he keeps in his backseat in case of an emergency.

20. The fact that Plaintiff Rodrick has had to purchase and use three different devices in order to keep his car operating as it should is not normal and was not expected at the time of purchase.

21. Lexus dealership employees have not provided any more help to Plaintiff Rodrick. They told him that the issues with the battery occur because he does not drive his vehicle enough; however, the battery monitor on his vehicle clearly shows that the charging ceases after driving for only a few minutes, and that it only charges to around 80% capacity. Dealership employees are unable to explain why this happens.

22. In other words, even after being replaced, Plaintiff Rodrick's vehicle battery is not working as it should. Further, because Lexus dealership employees have been unable to explain why this happens, Plaintiff Rodrick's battery could die again at any time, despite the three different devices he purchased to keep his vehicle operating.

23. Plaintiff Rodrick has suffered damages in the form of out-of-pocket costs of battery monitoring and charging devices, diminution in value of his vehicle, overpayment

for the vehicle at the time of sale, personal time spent dealing with the Defect, and loss of use of his Vehicle.

24. Had Toyota disclosed the Defect to Plaintiff Rodrick and/or the public, Plaintiff Rodrick would not have purchased his vehicle, or would have paid significantly less for it than he did.

**Plaintiff Robert Dade**

25. Plaintiff Robert Dade is a resident of Lahaina, Hawaii. Plaintiff Dade paid over $75,000 to purchase a new 2024 Lexus RX 450+ at Servco Lexus Maui, an authorized dealership located in Maui, Hawaii.

26. The battery in Plaintiff Dade's vehicle first died in or around June 2024, when the vehicle had only been driven for around 1,000 miles. He managed to jumpstart the battery himself following this incident and then delivered his vehicle to the dealership for further inspection. The dealership did not assist with the Defect further. As a result of these events, Plaintiff purchased a battery tender for approximately $30 from Costco to manage the battery health of his vehicle's battery.

27. Approximately a year later, the battery in Plaintiff Dade's vehicle died again. He attempted to contact his Lexus dealership but did not receive a response. Plaintiff Dade repeated the steps from the first incident to jumpstart his vehicle without driving his vehicle to the dealership.

28. Throughout early 2026, Plaintiff Dade began experiencing charging complications with his vehicle's battery, limiting the battery's ability to fully charge.

29. In April 2026, Plaintiff Dade's vehicle's battery died for the third time. Plaintiff jumpstarted his vehicle once again and contacted his dealership to schedule a service visit.

30. On or around July 6, 2026, after Plaintiff Dade noticed the health and voltage of the vehicle's battery had dropped, he brought the vehicle once again for servicing. The dealership could not identify an issue with the vehicle during this visit, despite Plaintiff's concerns that the battery health had been depleting. Following the visit, Plaintiff Dade contacted Lexus once again to provide his own review of the Defect as observed during the visit to the dealership. Plaintiff has not heard from any Lexus or Toyota representative since this interaction.

31. Plaintiff Dade's vehicle has now died unexpectedly three times, requiring time spent on trips to the dealership.

32. Plaintiff Dade has suffered increased anxiety, as well as losses in the form of diminution in value of his vehicle, personal time spent dealing with the Defect, and loss of use of his Vehicle for sometimes weeks at a time. Plaintiff Dade's battery could die again at any time, despite his use of the battery tender he purchased to keep his vehicle operating.

33. Had Toyota disclosed the Defect to Plaintiff Dade and/or the public, he would not have purchased his vehicle or would have paid significantly less for it than he did.

**Plaintiff Jamie Pabilonia**

34. Plaintiff Jamie Pabilonia is a resident of Manchester, Connecticut. Plaintiff Pabilonia paid over $75,000 to purchase a new 2023 Lexus RX 350h at Darcars Lexus of Englewood, an authorized dealership located in Englewood, New Jersey.

35. The battery in Plaintiff Pabilonia's vehicle died on or around January 28, 2026, when the vehicle had been driven for approximately 36,510 miles. After contacting Lexus Roadside assistance to address the Defect, Lexus Roadside requested AAA to jumpstart the vehicle. While her vehicle's battery was being jumpstarted, Plaintiff turned on her vehicle and received numerous warnings on her dashboard before the vehicle completely shut down again. Plaintiff once again contacted Lexus Roadside who had the vehicle towed to Plaintiff's dealership.

36. At the dealership, Plaintiff Pabilonia was told that a component of her battery was damaged during the attempt to jumpstart the vehicle's battery and needed to be replaced. The dealership indicated that the required part was on a national back order. AAA covered a majority of the expenses for the part and labor of the replacement, but Plaintiff was directly charged and paid $143.24 for the remainder of the costs.

37. Plaintiff's vehicle was inoperable and kept at the dealership for over four weeks. Initially, Plaintiff was not offered a loaner vehicle, but after a week without her own vehicle, she requested and was provided with a loaner.

38. Plaintiff Pabilonia's vehicle was equipped with a defective battery, which has unexpectedly died on one occasion so far, requiring Plaintiff to visit her dealership multiple times and depriving her of use of her car for multiple weeks.

39. Plaintiff Pabilonia has suffered losses in the form of diminution in value of her vehicle, personal time spent dealing with the Defect, and loss of use of her Vehicle for

sometimes weeks at a time. Moreover, Plaintiff Pabilonia's battery could die again at any time.

40. Had Toyota disclosed the Defect to Plaintiff Pabilonia and/or the public, she would not have purchased her vehicle, or would have paid significantly less for it than she did.

**Plaintiff Debra Akel**

41. Plaintiff Debra Akel is a resident of Danville, California. On or around September 21, 2024, Plaintiff Akel paid around $70,000 to purchase a new 2024 Lexus RX 350h from Valley Lexus of Modesto, an authorized dealership located in Modesto, California.

42. The battery in Plaintiff Akel's vehicle died for the first time on or around May 21, 2025, when the vehicle had been driven for only approximately 3,800 miles. At the time, Plaintiff Akel's vehicle had been sitting in her garage for fewer than three days since the last time she drove it. Plaintiff Akel had to contact AAA to jumpstart her vehicle. She then drove the vehicle to a nearby authorized Lexus dealership, Lexus of Pleasanton in Pleasanton, California.

43. At the dealership, Plaintiff Akel was told that the 12-volt battery was a dealership battery and that it needed to be replaced. The dealership replaced the battery with the promise that the replacement would be better quality than the previous one.

44. Despite the dealership's assurances that the replacement battery would be better than the first, less than a year later—on or around February 23, 2026—Plaintiff Akel's vehicle again would not start after sitting parked in her garage for fewer than three days since last driven.

45. Again, Plaintiff Akel had to contact AAA to jump her vehicle, and she took it back to the dealership, where the battery was replaced for a second time.

46. During her two visits to the Lexus dealership, Plaintiff Akel was told various reasons as to why the battery would not work properly. First was the dealership battery explanation. Then, she was told that the battery naturally drains while the car is parked for long periods of time, even though both times her battery died the vehicle had sat undriven for fewer than three days. She was also told that the battery would drain if the vehicle sits parked and unlocked.

47. These explanations create two problems for Plaintiff Akel. First, out of concern that this third battery will also die if the car is left undriven for more than a couple of days, Plaintiff Akel began to periodically take her vehicle for 15-20 minute drives, which costs her time, gas money, and unnecessary mileage and wear and tear on her vehicle.

48. Second, because Plaintiff Akel was told at the Lexus dealership that leaving her vehicle unlocked in her garage may cause the battery to drain and die, she locks her vehicle even though it is kept safe in her garage. However, Plaintiff Akel was advised by AAA that should the battery die while the vehicle is locked, AAA would not be able to jumpstart it, which would necessitate a costly tow should the battery die again.

49. Plaintiff Akel experiences stress and anxiety about the battery in her vehicle dying again while she is trying to leave for work. As she works as a flight attendant, being late for work means she may miss an entire shift, losing out on income and jeopardizing her employment.

50. Plaintiff Akel's vehicle was equipped with a defective battery, which has unexpectedly died twice so far, requiring Plaintiff to visit her dealership multiple times and depriving her of her car for multiple days.

51. Plaintiff Akel has suffered losses in the form of diminution in value of her vehicle, personal time spent dealing with the Defect, and loss of use of her Vehicle. Moreover, Plaintiff Akel's battery could die again at any time.

52. Had Toyota disclosed the Defect to Plaintiff Akel and/or the public, she would not have purchased her vehicle, or would have paid significantly less for it than she did.

**Plaintiff Vincent Sica**

53. Plaintiff Vincent Sica is a resident of Surprise, Arizona. On or around May 23, 2026, Plaintiff Sica purchased a new 2026 Lexus RZ 350 at Tustin Lexus, an authorized dealership located in Tustin, California.

54. Plaintiff Sica and his wife have periodically received notifications through the vehicle's mobile app that the 12-volt battery is "low" or "malfunctioning" within weeks of purchasing the vehicle.

55. Plaintiff Sica and his wife's vehicle's battery died for the first time on or around June 29, 2026, when the vehicle only had around 800 miles on it. The vehicle would not unlock, and therefore the vehicle could not be jumped.

56. Plaintiff Sica and his wife called Lexus Roadside Assistance, which arranged for a tow. Once the tow truck driver arrived, they were told a flatbed truck was required, so they had to wait again for one to arrive. During the wait, Plaintiff Sica did online research about the battery, located the plastic battery cover, and saw that the 12-volt

battery only had a charge of around 4.5 volts. Plaintiff Sica put the vehicle in neutral, pushed it out of his garage, and was finally able to have the vehicle towed to a nearby authorized Lexus dealership, Arrowhead Lexus located in Peoria, Arizona.

57. The Arrowhead dealership replaced the 12-volt battery and provided Plaintiff Sica and his wife with a rental car during the repair, for which they had to pay a $25 insurance deductible out-of-pocket.

58. Since the battery replacement, Plaintiff Sica and his wife continue to receive mobile app notifications that there are issues with the battery. Lexus employees told them to ignore the warnings, but Plaintiff Sica plans on bringing the vehicle to the Arrowhead dealership soon because he is concerned that this problem will persist, and his wife relies on the vehicle for daily transportation including traveling to work.

59. Plaintiff Sica's vehicle was equipped with a defective battery, which has unexpectedly died on one occasion so far, requiring Plaintiff and his wife to collectively spend around 12 hours of their time rectifying the issue in addition to their payment of a $25 insurance deductible.

60. Plaintiff Sica has suffered losses in the form of diminution in value of his vehicle, personal time spent dealing with the Defect, and loss of use of his Vehicle for sometimes weeks at a time. Moreover, Plaintiff Sica's battery could die again at any time.

61. Had Toyota disclosed the Defect to Plaintiff Sica and/or the public, he would not have purchased his vehicle, or would have paid significantly less for it than he did.

**Plaintiff Daniel McRae**

62. Plaintiff Daniel McRae is a resident of Browns Mills Junction, New Jersey. On or around July 31, 2025, Plaintiff McRae purchased a pre-owned 2023 Lexus RX 350

at Ray Catena Lexus of Freehold, an authorized dealership located in Freehold, New Jersey.

63. The battery in Plaintiff McRae's vehicle died for the first time in December of 2025, when the vehicle had been driven for approximately 30,000 miles. The vehicle would not start, so Plaintiff McRae called AAA to jumpstart the battery.

64. Approximately two weeks later, the same issue occurred again—Plaintiff McRae's vehicle would not start, so he had to call AAA to jump it.

65. Three weeks later it happened yet again—the vehicle would not start and Plaintiff McRae needed to rely on AAA to jumpstart it.

66. After this third battery failure, Plaintiff McRae purchased a new battery. His mechanic advised him that the battery that came with his vehicle had 600 cold cracking amps (CCA), so he purchased and had installed a battery with 750 CCA. The battery replacement cost him around $212.

67. Plaintiff McRae also purchased a portable charger for around $259 because he did not want to have to rely on AAA and subject himself to the wait time and hassle should the new battery die.

68. Plaintiff McRae decided to purchase his own battery and charger instead of contacting the Lexus dealership because he had read multiple complaints online from people who experienced the same 12-volt battery Defect but received little or no help from Lexus, including not having their batteries replaced.

69. Plaintiff McRae's vehicle was equipped with a defective battery, which unexpectedly died on three occasions, requiring Plaintiff to purchase a new battery and charger out-of-pocket and depriving him of time and use of his vehicle.

70. Plaintiff McRae has suffered losses in the form of diminution in value of his vehicle, personal time spent dealing with the Defect, out-of-pocket battery replacement costs, and loss of use of his Vehicle. Moreover, Plaintiff McRae's battery could die again at any time.

71. Had Toyota disclosed the Defect to Plaintiff McRae and/or the public, he would not have purchased his vehicle, or would have paid significantly less for it than he did.

**Plaintiff Catherine Doyle**

72. Plaintiff Catherine Doyle is a resident of Wesley Chapel, Florida. In November 2023, Plaintiff Doyle purchased a pre-owned 2022 Lexus NX 350 at Lexus of Tampa Bay, an authorized dealership located in Tampa, Florida.

73. Plaintiff Doyle purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the battery would properly function.

74. On July 18, 2025, Plaintiff Doyle and her husband were heading out to dinner to celebrate their 44th wedding anniversary. When Plaintiff Doyle tried to start her vehicle, it would not turn over. Plaintiff Doyle and her husband decided to take her husband's vehicle to dinner instead. When they returned from dinner, Plaintiff Doyle went to the garage where her vehicle was parked to try to start it again. She got in the vehicle with her key fob and shut the door. The vehicle tried to start, but then it completely died, locking Plaintiff Doyle inside the vehicle. The temperature in the garage was 90 degrees. Plaintiff Doyle did not have her phone on her. She was locked in the hot vehicle for approximately 15 minutes before, luckily, her husband found her in the vehicle. Her husband tried to

unlock the vehicle with the extra key fob, but it would not unlock. Plaintiff Doyle's husband frantically ran into the house to get the Lexus manual to try to find a way to get Plaintiff Doyle out of the vehicle. With no luck, he called Lexus Roadside Assistance. After approximately 45 minutes on the phone with Lexus Roadside Assistance, Lexus personnel were unable to help get Plaintiff Doyle out of the vehicle. Lexus Roadside Assistance told Plaintiff Doyle's husband to call 911, which he did. The fire department arrived approximately seven minutes later. The fire department removed the battery from Plaintiff Doyle's husband's vehicle, which was also a Lexus, to jump start Plaintiff Doyle's vehicle. Her vehicle started and the doors unlocked. Plaintiff Doyle was locked in the hot vehicle for approximately an hour and 15 minutes.

75. After getting the vehicle started, Plaintiff Doyle drove to the Lexus dealership and dropped the vehicle off. It was approximately 9:30pm, so Plaintiff Doyle left the keys in the dealership's drop box. The next morning, Plaintiff Doyle called her representative at the dealership and explained what had happened. The dealership replaced the battery with another 12-volt battery.

76. Plaintiff Doyle has suffered damages in the form of lost time spent dealing with the Defect as well as lost use of the vehicle, diminution in value of her vehicle, and overpayment for the vehicle at the time of sale.

77. Plaintiff Doyle would not have purchased the vehicle if she knew that it could be a safety hazard if her car battery died unexpectedly.

**Plaintiff Martha Samuel**

78. Plaintiff Martha Samuel is a resident of Fort Myers, Florida. Plaintiff Samuel purchased a new 2024 Lexus NX 350H at Scanlon Lexus (now Lexus of Fort Myers), an authorized dealership located in Fort Myers, Florida.

79. Plaintiff Samuel purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the battery would properly function.

80. The battery in Plaintiff Samuel's vehicle died in July 2026, when the vehicle had approximately 14,000 miles. After leaving an appointment, Plaintiff Samuel's vehicle was completely dead. She could not open the doors. Plaintiff Samuel's husband arrived with the extra key fob, but it did not unlock the vehicle. Lexus arrived and jumped the vehicle. Plaintiff Samuel's husband then drove the vehicle to Scanlon Lexus, where the dealership confirmed that the 12-volt battery was dead. An employee of the dealership told Plaintiff Samuel's husband that it was the fourth vehicle of the day that needed a new battery. The dealership installed another 12-volt battery in Plaintiff Samuel's vehicle.

81. Plaintiff Samuel's vehicle was equipped with a defective battery which has unexpectedly died on one occasion so far, locking Plaintiff Samuel out of her vehicle and requiring that the vehicle be taken to the dealership for the battery to be replaced.

82. Plaintiff Samuel has suffered losses in the form of diminution in value of her vehicle and personal time spent dealing with the Defect.

83. Had Toyota disclosed the Defect to Plaintiff Samuel and/or the public, she would not have purchased her vehicle, or would have paid significantly less for it than she did.

**Plaintiff Howard Werstil**

84. Plaintiff Howard Werstil is a resident of Fort Lauderdale, Florida. Plaintiff Werstil purchased a new 2024 Lexus RX 350H vehicle at JM Lexus, an authorized dealership located in Margate, Florida. Plaintiff also purchased a new 2025 Lexus RX 350H from JM Lexus.

85. Plaintiff Werstil purchased the vehicles for personal, family, and household use, and had a reasonable expectation that the battery in each vehicle would properly function.

86. The battery in each of Plaintiff Werstil's vehicles has died at least three times since he purchased them, including the battery in the 2025 Lexus dying twice in one day. The battery in each vehicle routinely dies when the vehicle has not been driven for approximately one week. Each time the battery has died, Plaintiff Werstil has either called Lexus and then Lexus sends AAA to jump the vehicle, or Plaintiff Werstil has called AAA directly to jump his vehicle, given the frequency at which the batteries die.

87. Plaintiff Werstil's 2024 Lexus currently has approximately 10,000 miles, and his 2025 Lexus currently has approximately 8,000 miles. Thus, each time the battery in Plaintiff Werstil's vehicles has died, as described below, the vehicle has had fewer than 10,000 miles or 8,000 miles, respectively.

88. In the fall of 2024, the battery in Plaintiff Werstil's 2024 Lexus died. AAA had to be called to jump the vehicle.

89. In approximately May 2025, the battery in Plaintiff Werstil's 2025 Lexus died, requiring AAA to come out and jump the battery. On that same day, after AAA jumped the battery, Plaintiff Werstil drove the vehicle approximately 10 miles before stopping for breakfast. When he returned to his vehicle a short time later, the battery was dead again, requiring AAA to come out again to jump the vehicle.

90. In approximately November 2025, Plaintiff Werstil again found the battery dead in his 2024 Lexus. AAA arrived to jump the battery.

91. In approximately May 2026, the battery in Plaintiff Werstil's 2025 Lexus died again, requiring AAA to come out and jump the vehicle.

92. In approximately June 2026, Plaintiff Werstil found that the battery on his 2024 Lexus was dead. AAA arrived to jump the vehicle, during which AAA told Plaintiff Werstil that the battery was not charging to the amperage that it should be.

93. Plaintiff Werstil's 2024 Lexus and 2025 Lexus vehicles are both equipped with a defective battery, both of which have unexpectedly died on several occasions, requiring Plaintiff Werstil to spend significant time trying to rectify the issue.

94. Plaintiff Werstil has suffered damages in the form of lost time spent dealing with the Defect as well as lost use of the vehicles, diminution in value of his vehicles, and overpayment for the vehicles at the time of sale.

95. Had Toyota disclosed the Defect to Plaintiff Werstil and/or the public, he would not have purchased his vehicles, or he would have paid significantly less for them than he did.

**B. Defendants**

96. Toyota Motor North America, Inc. ("TMNA") is a California corporation with its principal place of business located at 6565 Headquarters Drive, Plano, Texas. It has additional offices throughout the company, including in Torrance, California; Georgetown, Kentucky; Washington, D.C.; Ann Arbor, Michigan; New York, New York; and San Ramon, California. TMNA is a wholly owned subsidiary of Toyota Motor Corporation, a Japanese corporation. TMNA is the holding company for the North American operations of Toyota Motor Corporation and its other corporate affiliates and subsidiaries. TMNA's activities include advertising, marketing, distributing, leasing, warranting, and servicing Lexus vehicles through Toyota's approximately 1,800 dealerships throughout the United States.

97. Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is a Kentucky corporation with its principal place of business located at 6565 Headquarters Drive, Plano, Texas. Like TMNA, it is a wholly-owned subsidiary of Toyota Motor Corporation. In addition to Texas, it also has major operations in Arizona, California, and Michigan. TEMA provides support to Toyota's North American manufacturing plants in areas including purchasing, production control, production engineering, quality control, and administration. It shares responsibility for Toyota's engineering, design, research and development, and manufacturing activities with Toyota's fourteen manufacturing plants in North America.

98. Toyota Motor Sales, U.S.A., Inc. ("TMS") is a California corporation with its primary place of business located at 6565 Headquarters Drive, Plano, Texas. From its founding in 1957 until 2017, its principal place of business was located in Torrance, California. It is a wholly owned subsidiary of Toyota Motor Corporation and engages in the marketing, sales, and distribution of Lexus cars through Toyota's approximately 1,800 authorized dealers throughout the United States.

## IV. FACTUAL ALLEGATIONS

### A. Development and Production of the Class Vehicles

99. The Lexus RX is a "luxury crossover vehicle" and a "core model to Lexus."[2] The fifth generation of the Lexus RX was released in 2022.[3] Defendant TMS owns and is responsible for the Lexus brand.[4]

100. Between its American debut in 1998 and fifth generation release in 2022, Toyota sold approximately 3.5 million Lexus RX vehicles across 94 countries.[5]

101. Toyota released its first Lexus RX model in 1998[6] and debuted the fifth generation, the 2023 Lexus RX, in 2022.[7] Since the release of the 2023 Lexus RX, Lexus has consistently released new RX models each year.

---

[2] *World Premiere of the All-New Lexus RX*, LEXUS (June 1, 2022), https://global.toyota/en/newsroom/lexus/37367383.html.

[3] *Id.*

[4] *Who Manufactures Lexus?*, LEXUS, https://www.lexusofalbuquerque.com/who-manufactures-lexus/#:~:text=Yes%2C%20the%20Lexus%20brand%20is%20owned%20by,of%20quality%20parts%20and%20vehicles%20takes%20place (last visited Apr. 7, 2026).

[5] *Id.*

[6] *Looking Back: The Evolution of the Lexus RX*, LEXUS (Dec. 6, 2022), https://pressroom.lexus.com/looking-back-the-evolution-of-the-lexus-rx/.

[7] *Id.*

102. Toyota released its first Lexus NX model in late 2014 as a 2015 model-year vehicle. The Lexus NX is a compact vehicle, smaller than the RX in all major dimensions, and slightly less expensive. The second generation was released in 2022, featuring a complete redesign and adding new technology and powertrains. The Lexus NX has been produced every year since its 2015 model-year debut.

103. Toyota released its first Lexus RZ model in 2023 and has released a new RZ model every year since. It is a fully electric mid-sized luxury crossover SUV and the first fully battery-powered electric vehicle created under the Lexus brand.

**B. The Battery Defect**

104. The 12-volt battery in the Class Vehicles operates accessories like windshield wipers, lights, powered windows and seats, heating and cooling fans, and the radio. The 12-volt battery is also necessary to start the motor. If the 12-volt battery does not have an adequate charge, the Class Vehicles will not start.

105. When a vehicle is running, it is expected for the 12-volt load to be powered by the vehicle's charging system, thereby recharging the battery. For a 12-volt battery to charge, a sufficient amount of voltage and current is required for a sufficient amount of time.

106. The 12-volt batteries are recharged by driving the Class Vehicles. However, the 12-volt charging and battery systems in the Class Vehicles are defective and, as a result, the 12-volt batteries: (i) are not adequately recharged while driving; and (ii) rapidly drain until empty prematurely when the vehicle is not in operation. The drain of electricity from the battery quickly disables the battery, making it impossible to operate the Class Vehicle. The defect also causes other components of the Class Vehicles, such as the

electrical system and safety features—which rely on the battery to function—to malfunction or cease working altogether.

107. Upon information and belief, Class Vehicles use software to control charging, which is used in combination with hardware sensors that monitor the battery. For battery longevity, a specific charging strategy is used to ensure that a car battery is properly charged. A precise charging strategy is essential: batteries that are undercharged or overcharged will have reduced longevity.

108. In the case of the Class Vehicles, a defect within the software in the Data Communication Module is causing the batteries to drain rapidly, resulting in parasitic drain that depletes battery life and leaves vehicles dead.

109. The Data Communications Module (DCM) is essentially a small computer inside the Class Vehicles, which connects the vehicles to the internet, handles safety help, remote locks, and SOS calls. Under normal conditions, when a car is off, the DCM should go to "sleep" to save power. A "drain" happens when a part refuses to go to sleep, akin to leaving a light on in an empty room overnight. Due to a software defect within the Class Vehicles, the DCM fails to go to sleep and instead stays powered on and searching to send and receive data, thereby resulting in parasitic battery drain. If a car sits parking overnight or for a couple of days, this parasitic drain can completely empty the 12-volt battery.

110. Consumers report that their Class Vehicles' 12-volt batteries drain in as quickly as a few weeks, even on days with little to no driving.

111. Toyota itself, in its Technical Service Bulletin ("TSB") No. L-SB-0016-23[8], pertaining to a number of 2024 Lexus vehicles mentions the dangers of so-called "parasitic

[8] *Battery Maintenance During PDS*, LEXUS (Mar. 13, 2023), https://static.nhtsa.gov/odi/tsbs/2024/MC-10248820-9999.pdf.

drain" (wherein a vehicle's 12-volt battery drains when the car is seemingly otherwise not in use), noting that certain conditions like parasitic draw "can reduce [the battery's] performance and service life."

112. A parasitic drain occurs when electrical devices continue to draw power from the battery even after the user has turned off the vehicle. While some drain is normal, it can escalate if faulty compoments or malfunctioning accessories constantly draw power, such as when the DCM fails to go dormant as intended.

113. In another service bulletin pertaining to 2024 Lexus vehicles, TSB No. L-SB-0015-23, Toyota again mentioned that a "parasitic current" could reduce the battery's charge.[9]

114. These TSBs do not stop at the 2024 RX, NX, and RZ models. TSB No. L-SB-0001-24 mentions that "parasitic drain" can cause a reduction in performance and service life for 2025 Lexus vehicles.[10]

115. Accordingly, Toyota knew about the Battery Defect, its underlying cause, and the symptoms associated with it since at least 2021. Nevertheless, Toyota has at all relevant times failed to disclose and affirmatively concealed this defect in its marketing materials and other communications addressed to vehicle customers and owners.

116. The Battery Defect has three deleterious effects:

A. First, the 12-volt batteries often lack sufficient charge to start the vehicle when needed, rendering the Class Vehicles inoperable,

---

[9] *Maintenance for HV/BEV and Auxiliary Batteries*, LEXUS (March 13, 2023), https://static.nhtsa.gov/odi/tsbs/2023/MC-10244125-9999.pdf.

[10] *Battery Inspection and Maintenance During PDS*, LEXUS (Jan. 24, 2024), https://static.nhtsa.gov/odi/tsbs/2025/MC-11014201-0001.pdf.

unexpectedly standing drivers and passengers, which can lead to unsafe circumstances and the added expense of towing services.

B. Second, because the 12-volt batteries operate many of the accessory systems in the Class Vehicles—including the computer systems required to manage the drive motors—the Class Vehicles may shut down suddenly, even while driving, when the 12-volt battery is discharged. This presents an unreasonable safety risk for drivers, passengers, and the general public.

C. Third, repeated cycles of inadequate charging ultimately destroy the 12-volt batteries, requiring their premature replacement. Ultimately, fully discharging a 12-volt lead-acid battery causes the lead-acid medium to crystallize, such that it can no longer hold a charge. As noted above, 12-volt batteries typically have an expected useful life of several years and hundreds or thousands of charge cycles over tens or hundreds of thousands of miles. The Battery Defect shortens that useful life.

117. When the 12-volt batteries unexpectedly die, an individual may be prone to jump-starting the vehicle so they can start the vehicle. However, jump-starting requires carrying the proper knowledge and equipment, may require the presence of another vehicle, and can itself damage the 12-volt battery.

118. To Plaintiffs' knowledge, Toyota has never offered any permanent or effective fix to the Battery Defect. Toyota also failed to disclose this material information, of which it had knowledge, at the time of purchase and has concealed it, or at least failed to disclose it, at any point thereafter.

119. At best, dealers may replace failed 12-volt batteries under warranty, but without a permanent repair for the defective battery, those batteries will inevitably continue to fail prematurely. That is not a tenable solution. As discussed below, Plaintiffs have experienced numerous battery failures and have had to prematurely replace their 12-volt batteries.

120. Toyota uniformly designed and/or manufactured the Class Vehicles with defective components and/or software which causes parasitic battery drain. These defective components were designed, installed, and/or manufactured by Toyota and were present in the Class Vehicles at the time of sale.

**C. Defendants Knew About the Battery Defect**

121. Toyota is aware of the Battery Defect. Toyota learned of the Battery Defect prior to taking the Class Vehicles to market. Indeed, as part of its research, development, and pre-sale testing of the Class Vehicles, Toyota performed various tests that replicate actual consumer use of the battery over hundreds or thousands of miles. As part of that testing and research, Toyota would have learned of the Battery Defect and that the batteries fail before their useful life, thereby presenting a safety hazard and having a material impact on the reliability of the Class Vehicles. Toyota further learned of the Battery Defect through the TSBs discussed above.

122. Toyota also became aware of the Battery Defect after launching the Class Vehicles, but before Plaintiffs and other Class Members purchased the Class Vehicles, by way of the numerous consumer complaints about the issue. Instances of the battery failures are widespread, and Defendants are aware of them, not only because Plaintiffs and Class members brought them to Defendants' attention by bringing their vehicles to Defendants' authorized dealers but also because of the many complaints lodged by consumers with the

National Highway Transportation Safety Agency ("NHTSA"), with Defendants directly, and in online fora that Defendants, on information and belief, monitor.

123. NHTSA maintains a database of motor-vehicle consumer complaints submitted since January 2000. Consumers are able to submit complaints online or by phone in which they provide information that includes the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, and a description of the incident. Defendants have an obligation to monitor the NHTSA database to identify potential defects in its vehicles, pursuant to the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000)

124. Below are examples and excerpts from NHTSA, various online forums, and a news article that illustrate consumers' experiences with the Battery Defect in the Lexus RX, Lexus NX, and Lexus RZ:

NHTSA ID Number: 11711016

Incident Date: January 5, 2026

Consumer Location: PEACHTREE CORNERS, GA

The 2023 Lexus RX-350 has had complete 12 volt battery failure twice in the last year. The hybrid battery charging procedure for the 12 volt battery is insufficient. Twice I have been stranded. The frequency and duration of the hybrid battery charging is not sufficient. A more powerful 12 volt AGM battery is needed. The dealer says I am not taking sufficiently long trips to charge the battery. Last Saturday I took two 30 - 40 minute trips but the battery had only 11.8 volts requiring a 100% charge. There should be a recall to fix this problem.

NHTSA ID NUMBER: 11710076

Incident Date: January 8, 2026

Consumer Location: GAITHERSBURG, MD

If we don't drive the car for 4 or 5 days, especially in cold weather, the car will sometimes not start due to a drained 12V battery. We've spoken to Lexus of Rockville, MD and Lexus roadside assistance, who are aware of the issue but say the 12V battery is "healthy." Online research shows this is a widespread known issue with Lexus RX350h and RX500h vehicles from 2023 onward: [XXX] [XXX] . A simple software update to ensure that the high-voltage hybrid battery charges the 12V battery to a greater extent when the vehicle is parked should solve the problem, but Lexus has so far not addressed this problem. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

NHTSA ID NUMBER: 11708193

Incident Date: September 14, 2024

Consumer Location: LOS ALTOS, CA

[2024 Lexus RX] The car started showing multiple error messages on the dash and then shut off while in operation, it would not restart without a service call and battery boost. This has happened multiple times. Online research shows this is a common issue with the hybrid models - the 12v battery doesn't get adequately charged, voltage drops and car ceases to work - even while mid drive on the road, this is extremely scary and dangerous.

NHTSA ID NUMBER: 11708068

Incident Date: January 8, 2025

Consumer Location: CINCINNATI, OH

[2024 Lexus RX] Battery has “sulfated” twice in 15 months of ownership. Lexus/dealer have replaced battery two times. Considered safety issue since battery could “die” at any time. Could be locked out of car with infant inside or if battery dies while driving, car could become immobile.

NHTSA ID NUMBER: 11671336

Incident Date: December 18, 2024

Consumer Location: LEWES, DE

[2024 Lexus RX] Brand new vehicle- 12volt battery failed after 5 weeks. Lexus initially stated battery fine. Then battery failed while in their possession- Lexus replaced battery. Few weeks later battery failed again. Lexus tested & replaced battery for second time - but battery kept draining & they were unable to repair after having vehicle at dealership for 3.5 months

NHTSA ID NUMBER: 11667000

Incident Date: June 14, 2025

Consumer Location: ALTOONA, FL

[2024 Lexus RX] This car is a hybrid. it is 15mos. old w/13500 miles. I've had two 12v battery failures which resulted in 1 time being locked out of car, and 1 time locked in.

NHTSA ID NUMBER: 11648649

Incident Date: March 16, 2025

Consumer Location: TRYON, NC

[2024 Lexus RX] The vehicle would not start. It is a known problem with this PHEV that if car is not used for a couple of days the 12v battery becomes depleted and the car cannot be started and all systems of the car are dead.

NHTSA ID NUMBER: 11648610

Incident Date: March 8, 2025

Consumer Location: GRAYSLAKE, IL

The vehicle was locked, parked in garage. 12V battery failed. Vehicle became a brick. Vehicle had to be towed to dealership. Battery changed under warranty.

NHTSA ID Number: 11748584

Incident Date: July 5, 2026

Consumer Location: IRVINE, CA

[2024 Lexus NX] On 2026-07-05, my car started except the digital instrument panel was blank/black. This meant the digital gas and battery gauges weren't visible, in addition to the speedometer, etc. I tried restarting the car to see if it was a fluke but it did not come back. On 2026-07-06, the car worked fine / as expected, but after a google search, it seems like this happens to other owners as well in the past with no clear reason why. Wanted to report in case it becomes a larger thing.

NHTSA ID Number: 11656901

Incident Date: April 24, 2025

Consumer Location: PACIFICA, CA

My 2024 Lexus NX 450h+ experienced a complete 12V battery failure after normal short-distance driving, leaving me stranded without warning. This is a known defect in Lexus plug-in hybrids that the manufacturer has not properly disclosed to buyers. Incident Details: After several short trips (all under normal driving conditions), my 2024 Lexus NX 450h+ failed to start. The vehicle was completely non-responsive. Because the doors and liftgate were locked and inoperable, I was forced to crawl through the rear cargo area with a pre-existing mobility issue (bad leg), causing significant physical pain and emotional distress. I later had to visit the Emergency Room due to pain and strain from the incident and was prescribed medication. When I reported the problem to Lexus Corporate, they initially attempted to shift blame onto my roadside assistance provider (AAA) instead of acknowledging the mechanical defect. No solution was offered to ensure the vehicle's reliability for daily use. Ongoing Concerns: •Lexus has not issued a recall or fix for the widespread 12V battery failures affecting plug-in hybrid vehicles. •This issue poses a significant safety risk, particularly to older drivers, disabled individuals, and anyone who relies on their vehicle for essential transportation. •I purchased this vehicle at a premium price, expecting reliability, and it has failed in fundamental ways. •Being stranded without warning and physically harmed while trying to exit my own vehicle is completely unacceptable for any car, let alone a brand-new luxury model. Given the known nature of this defect (widely reported by other owners online), Lexus must be held accountable for addressing the safety hazards caused by faulty 12V battery systems in its 2024 NX 450h+ plug-in hybrid.

NHTSA ID Number: 11610320

Incident Date: March 31, 2024

Consumer Location: BELLEVUE, WA

[2024 Lexus NX] Less than 10 months old (March and April 2024 at ~5,000 miles), the 12V battery completely drained 3 times in 5 days (despite driving it regularly during that period) so the car would not start when needed. I had it jumped 3 times by AAA and the third time drove it to dealer. Dealer told me battery was defective so it needed to be replaced under warranty. Problem reported to Lexus Customer Service. The same problem recurred 3 months later (July 2024 at 6000 miles) the morning I was packing it to leave on vacation. The battery died while I was in the car and I was locked inside. When I got out, the doors locked again so had to have the car towed to a different dealer. They told me the battery needed to be replaced AGAIN under warranty. Two Lexus dealers, Lexus Customer Service, and Lexus on-line forum have noted this problem with several Lexus hybrid and PHEV models for a period of 1-2 years. When I asked, Lexus (2 dealers and Customer Service) told me that there is a defect in the software or app communication settings that causes a continuous drain on the 12V battery causing battery to fail unexpectedly. There has been NO NOTIFICATION of this defect and no resolution to this problem has been provided in the past 5 months. It is a risk for the entire electrical system to fail unexpectedly for no apparent reason with NO WARNING. The car is unreliable and cannot be used if it will not start when it is needed. We are elderly and have grandchildren living with us periodically. We are at risk if we cannot get to medical appointments or drive to the hospital.

NHTSA ID Number: 11660591

Incident Date: February 21, 2025

Consumer Location: Unknown

My 2023 Lexus RZ450e experienced a sudden failure of the 12-volt battery, which completely disabled the vehicle and prevented it from starting. The battery failed while the car was plugged into a Level 2 home charger, but not in 'Ready' mode. There were no warning signs or alerts, and I had to call roadside assistance to jump-start the car. After the incident, I brought the vehicle to the dealership. They tested the 12V battery and said it was "fine." However, during the 100,000-mile maintenance, I specifically requested a battery re-check—and this time, the battery failed the test. This raises serious concerns about the reliability and longevity of the 12V battery in this vehicle, as well as the inconsistent diagnostics at the dealership. If the vehicle had failed to start while I was away from home, I could have been stranded in unsafe conditions. Safety Concerns: The 12-volt battery powers essential systems, including door locks, ignition, and electronic control units. Its failure disables the entire vehicle. The fact that this happened while the car was plugged in, but not in "Ready" mode, suggests a potential design flaw or charging system issue. I've also seen reports from other RZ450e owners experiencing similar 12V problems, which may point to a broader systemic issue. Requested Action: Please investigate potential defects in the 12-volt battery system and whether the Lexus RZ450e's charging system fails to maintain battery health during regular use.

NHTSA ID Number: 11698167

Incident Date: March 15, 2025

Consumer Location: WEST NYACK, NY

[2024 Lexus RZ] Vehicle Completely Locks itself. Not able to open doors. Even Not able to open with keyless remote fob. Not able to take Charging cable connection out of vehicle. It has happened twice. Lexus was made aware of this issue. I have been stranded twice. It is a safety issue and requesting NHTSA to recall.

Complaint from a 2024 Lexus RX 350h driver, May 27, 2025[11]

Well my 2024 Rx350h left me stranded at a beach campsite in Oregon (I live in Calif.). Anyway AAA would not jump it. Towed to a Toyota dealership (Lexas [sic] 300 miles away) renting a hotel room waiting to hear news tomorrow morning. May need to have it towed another 100 miles to Lexus. Lexus would not tow to dealership. Saying you only get 35 miles. Wish me luck. Not to happy!!!

Complaint from a Lexus RX350 driver, May 10, 2024[12]

Purchased RX new in March 2023, it's our second car and not a regular driver. After sitting for a month battery went dead. When we went to start car all doors locked with driver inside. All electrical dead. Had to crawl out trunk. Dealer towed to shop and we were told battery was fine and needed to drive every week or get a battery buddy and keep plugged in when not driving. That made no sense to me but we

[11] Hjacobs911, LEXUS OWNERS RX (May 27, 2025), https://www.lexusrxowners.com/threads/battery-issues.350/.

[12] tdhalvorson, LEXUS OWNERS RX (May 10, 2024), https://www.lexusrxowners.com/threads/lexus-2023-rx-battery-issues.237/.

tried drive more. We followed their Instructions and drove every week but battery went dead again. on the third time we told dealer to keep the RX till they had it fixed while I went BMW shopping. In a week the dealer called and had problem solved and had replaced battery. Claimed it was a fault deep in battery and hard to detect. Driven now for four months and no issues. Worse part is dealership acted like they didn't believe our problem was real until a salesman had same happen to him in our RX. If you have electrical issues with your Lexus RX make them replace your battery first!

Complaint from a 2023 Lexus RX 350 driver, May 24, 2025[13]

I have 2023 Lexus RX 350 3000 kms (1800 miles). When the vehicle is not driven for 3 or 4 days during cold weather the battery dies. The dealership claims this happens because The vehicle is not driven enough. The first battery replacement they covered by warranty with no problem. For the second battery replacement they claimed no warranty coverage since the problem was caused by not driving enough. I challenged their claim and they eventually covered under warranty. When battery problem occurs a warning light appeared "shift system malfunction". I don't believe they know how to resolve this problem.

Complaint from a Lexus RX 350h driver, February 24, 2026[14]

[13] Swaggy, LEXUS OWNERS RX (May 24, 2025), https://www.lexusrxowners.com/threads/lexus-2023-rx-battery-issues.237/.

[14] Tango9, LEXUS OWNERS RX (Feb. 24, 2026), https://www.lexusrxowners.com/threads/lexus-2023-rx-battery-issues.237/.

My RX350H brand new from Lexus since May 2023. So far, the battery dead for the 3rd times in about 30 months. 3 new batteries were replaced. My friend who had the same model and had also replaced 3 new batteries. Not sure the warranty period of the battery. Is warranty lasts for 8 years? Not sure how much I have to pay for replacing the new battery after the warranty period, not to mention the trouble I will encounter when I park outside home.

Complaint from a 2025 Lexus RX 350h driver[15]

This is great work OP. Put me on the list of Lexus 2025 RX 350h owners looking for a solution to the battery drain issue on their hybrids. My 12V battery is toast after only 12 months of ownership.

I'm hoping Lexus changes their garbage charging software to fix the issue, but I think I have to give your solution a shot.

Complaint from a 2024 Lexus RX 350h driver, March 30, 2026[16]

I went overseas for 30 days, and when I got back, the battery on my 2024 RX350h was dead. The battery is located under the trunk, and I couldn't open the trunk without power. Lexus Roadside Assistance came out and jump-started the car. The technician recommended that I buy a NOCO Genius 1 charger from Amazon (about

[15] bomby0, REDDIT, https://www.reddit.com/r/Lexus/comments/1npkob4/toyotalexus_hybrid_12v_battery_failures_analysis/.

[16] TexasLexusHybrid, FACEBOOK (Mar. 30, 2026, at 10:39 EST), https://www.facebook.com/groups/546963663229841/?multi_permalinks=1614380076488189&hoisted_section_header_type=recently_seen.

$30) and keep it plugged into AC power next time I travel.

I also took the car to the dealership to have the battery and starter tested, and they ended up replacing the battery.

Has anyone else had their battery die on a 1.5-year-old car?

Complaint from a 2024 Lexus RX 350h driver, September 3, 2025[17]

Recently bought a 2024 demonstrator RX350h from a dealer and I really like it. Great car. There are some little things I might comment about but seriously,… nothing major. What DID need a comment though was the fact that the 12v battery died completely after only 14 months and everything shut down and I got locked out of the car. Roadside assist came and changed the battery and we're off again. Has anyone experienced this early battery failure? Is it common?

Complaint from a 2024 Lexus RX 350F driver, May, 2025[18]

Our 2024 RX 350F sport has had dead battery issues at least 6 times. We only have 4500 miles on it. Something is draining the battery and we can't seem to isolate it. Dealership has tested the battery and charging systems 3 times and state everything is fine. Drove the car a few days ago 80 miles and the day after battery was dead again. Something is draining this battery and we can't figure out what it is. Any help, suggestions appreciated! Seems crazy to spend over 60k on a new vehicle to

[17] Bruce Bedwell, FACEOOK (Sept. 3, 2025), https://www.facebook.com/groups/298564897176011/posts/2513248425707636/.

[18] Lopeka, CLUB LEXUS (May 2025), https://www.clublexus.com/forums/rx-5th-gen-2023-present/1040032-2024-rx-f-sport-battery-problems.html.

have this happen! This is our second RX and wish we never traded our 2015 which never had a battery die!

Complaint from a 2022 Lexus NX 450H driver, February 16, 2023[19]

Having an issue with my 2022 nx450h. When ev battery empty and in traffic 12v battery keeps going flat (see pictures). When moving again recharges fine but in stop start slow traffic if it goes on too long it dies and I have to call AA. Any ideas as lexus failing into diagnose?

Complaint from a 2026 Lexus RZ 450E driver, July 1, 2026[20]

*2026 Lexus RZ 450E and have it two weeks – dead 12v battery*

Okay the more I read posts I find this is an issue in these cars. Jumped it got it to the dealership they did their testing and they said it's fine. Before we took it to the dealership we came out the next day battery dead jumped it drove it next morning dead again so that's when we took it to the dealership and like I said dealerships said it was fine they let it sit overnight started up battery was fine. I've heard there's some tricks to keeping the 12 volt battery charged. If anybody has any tips please let me know I don't want to go through this again if you have a battery tender anybody have an idea of which one's the best one maybe where to mount it?? Any help would be appreciated thanks so much

[19] https://www.lexusnxforum.com/threads/12v-battery-going-flat-in-traffic.8122/

[20] https://www.rzforums.com/threads/2026-lexus-rz-450e-and-have-it-two-weeks-dead-12v-battery.632/

News Article about TikTok from @lexusrx500__, October 10, 2024[21]

> This is our second brand new Lexus in the past year and a half that has died randomly. Both have been determined to have defective 12v batteries from the factory.

125. Despite knowing about these problems with the 12-volt batteries, Defendants continued to include the defective batteries in the Class Vehicles and continued to sell and lease these vehicles without eliminating the Battery Defect and without disclosing it to Plaintiffs and Class members in warranty manuals, on Defendants' websites, in advertisements, on Monroney stickers, or elsewhere.

## V. RULE 9(B) ALLEGATIONS

126. To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Fed. R. Civ. P. 9(b) by establishing the following elements with sufficient particularity:

127. **WHO**: Defendants sold and leased Class Vehicles to consumers nationwide without disclosing the Battery Defect to Plaintiffs and Class members in warranty manuals, on Defendants' websites, in advertisements, on Monroney stickers, or elsewhere, and then failed to adequately repair the Battery Defect.

128. **WHAT**: Defendants failed to disclose and then adequately repair a uniform and widespread Defect in the battery charging systems of Class Vehicles that causes the 12-volt batteries to repeatedly lose their charge.

129. **WHERE**: Defendants' violations of statutory and common law are conducted through their warranty manuals, websites, advertisements, Monroney stickers, and elsewhere.

---

[21] Mustafa Gatollari, *'After 2 Weeks of Ownership': Lexus Customer Says His 2024 RX 350 'Died Randomly,'* DAILY DOT (Oct. 10, 2024, at 14:00 CDT), https://www.solterraforum.com/threads/5-months-and-dead-battery.1960/.

130. **WHEN**: Defendants have been selling and leasing defective vehicles for years, and the scheme is ongoing. Information as to precisely how long Defendants have been selling and leasing defective vehicles is exclusively in the possession of Defendants.

131. **WHY**: Defendants sell and lease defective vehicles to generate revenue without expending the cost of redesigning the 12-volt batteries to cure the Defect, and to induce consumers into purchasing vehicles they otherwise would not have purchased, or would have paid significantly less for it than they did. As a direct result of this scheme, Defendants have successfully reaped tens of millions of dollars in unlawful charges at the expense of unsuspecting customers.

132. **HOW**: Defendants sell and lease Class Vehicles to consumers nationwide without disclosing the Battery Defect to Plaintiffs and Class members in warranty manuals, on Defendants' websites, in advertisements, on Monroney stickers, or elsewhere, and then failed to adequately repair the Battery Defect. Defendants' conduct violated consumer protection laws and the common law as alleged in detail above and below.

## VI. CLASS ACTION ALLEGATIONS

133. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Nationwide Class"), defined as:

Any person in the United States who purchased or leased a Class Vehicle.

134. In addition to the Nationwide Class, Plaintiffs also seek to represent the each of the following state subclasses as defined below:

> **California Subclass:** All persons who bought or leased a Class Vehicle in the State of California.
>
> **Florida Subclass:** All persons who bought or leased a Class Vehicle in the State of Florida.
>
> **New Jersey Subclass:** All persons who bought or leased a Class Vehicle in the State of New Jersey.

> **Hawaii Subclass:** All persons who bought or leased a Class Vehicle in the State of Hawaii.

135. The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

136. **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class members, since such information is in the exclusive control of Defendants. Nevertheless, the Class encompasses at least tens of thousands of individuals dispersed throughout the United States. The number of Class members is so numerous that joinder of all Class members is impracticable. The names, addresses, and phone numbers of Class members are identifiable through documents maintained by Defendants.

137. **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class members. These common questions include:

i. whether the Class Vehicles are Defective;
ii. whether Defendants had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;
iii. when Defendants became aware of the existence of the Battery Defect in the Class Vehicles;
iv. whether Defendants knowingly failed to disclose the existence and cause of the Battery Defect in the Class Vehicles;
v. whether Defendants knowingly concealed the Battery Defect in the Class Vehicles;
vi. whether Defendants' conduct as alleged herein violates consumer protection laws;
vii. whether Defendants' conduct as alleged herein violates warranty laws;
viii. whether the Class Vehicles are unmerchantable;

ix. whether Defendants' conduct as alleged herein violates other laws asserted herein;

x. whether Plaintiffs and Class members overpaid for their Class Vehicles as a result of the defect;

xi. whether Plaintiffs and Class members have suffered an ascertainable loss as a result of the defect; and

xii. whether Plaintiffs and Class members are entitled to damages and equitable relief.

138. **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because all Class members were comparably injured through Defendants' substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class members arise from the same operative facts and are based on the same legal theories.

139. **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in automobile class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

140. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not; individualized litigation creates a potential for

inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## VII. ANY APPLICABLE STATUES OF LIMITATION ARE TOLLED

### A. Discovery Rule

141. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that the Class Vehicles had one or more design and/or manufacturing defects that caused the Class Vehicle batteries to lose charge and/or require premature replacement.

142. Plaintiffs and Class members had no realistic ability to discover the extent of the design and/or manufacturing defects until their Class Vehicles' 12-volt batteries suddenly died, potentially leaving them stranded, and requiring jump-starting, towing, and/or battery replacement. Plaintiffs and Class members would have had no reason to individually believe that the problems with their Vehicles were the result of a widespread design and/or manufacturing defect. Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

### B. Equitable Estoppel

143. Defendants are equitably estopped from asserting the statutes of limitations. Defendants misrepresented that the Class Vehicles were safe and free from defects. Defendants knew that the Class Vehicles were unsafe and unable to perform as advertised without risking battery failures. Plaintiffs and Class members, by contrast, were unaware of the true nature of the Class Vehicles and relied upon Defendants' misrepresentations and omissions. Plaintiffs and Class members will be prejudiced if Defendants are not estopped.

## VIII. CAUSES OF ACTION

## COUNT I

### FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT
**Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses**

144. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

145. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class and State Subclasses against Defendants.

146. The Class Vehicles that Plaintiffs and Class members purchased or leased were defective because the charging system inadequately charges the 12-volt batteries, leading to sudden and premature battery failures.

147. Defendants failed to disclose the Battery Defect and acted with reckless disregard for the truth when they failed to disclose that the Battery Defect would render the Class Vehicles prone to sudden and premature battery failures.

148. Defendants had a duty to disclose this material information to Plaintiffs and Class members because Defendants were in a superior position to know about the existence, nature, cause, and results of the Battery Defect; Plaintiffs and Class members could not reasonably have been expected to learn or discover the Battery Defect; and Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn about or discover the Battery Defect.

149. Plaintiffs and Class members did not know about the Battery Defect and could not have discovered it through reasonably diligent investigation.

150. But for Defendants' fraudulent omissions of material information, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have

paid less for them. Plaintiffs and Class members have sustained damage because they purchased or leased Vehicles that were not as represented. Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles.

151. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class members, and for Defendants to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, that amount shall be determined according to proof at trial.

## COUNT II

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### Plaintiffs Individually and on Behalf of the Nationwide Class and the State Subclasses

152. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

153. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class and State Subclasses against Defendants.

154. Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

155. The Class Vehicles are "goods" as defined under the UCC.

156. A warranty that the Class Vehicles were in merchantable quality and condition is implied by law in transactions for the purchase and lease of the Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable

condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

157. The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used, and fall short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the charging system inadequately charges the 12-volt batteries, leading to sudden and premature battery failures. The Battery Defect renders the Class Vehicles unmerchantable.

158. Defendants were provided notice of the issues complained of herein by numerous complaints it received about them.

159. Plaintiff and the other Class members have had sufficient direct dealings with either Defendants or its agents to establish privity of contract between Defendants on one hand, and Plaintiff and each of the Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class members are intended third-party beneficiaries of contracts between Defendants and its dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

160. As a direct and proximate result of the breach of said warranties, Plaintiff and Class members were injured, and are entitled to damages.

## COUNT III

**UNJUST ENRICHMENT**
**In the Alternative to All Other Claims**
**Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses**

161. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

162. All Plaintiffs bring this claim individually and on behalf of the Nationwide Class and State Subclasses.

163. This claim is pleaded in the alternative to the other claims set forth herein.

164. As the intended and expected result of its conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of Class Vehicles that contain the Battery Defect.

165. In particular, the value of the Class Vehicles was artificially inflated by Defendants' concealment of the Battery Defect, and Plaintiffs and Class members overpaid for the cars and have been forced to pay other costs.

166. As a result of theirwrongful acts, concealments, and omissions of the Battery Defect in its Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

167. Moreover, Defendants continue to profit from theirongoing wrongful behavior by denying the nature and existence of the Battery Defect to Plaintiff and Class members during the duration of the Warranties, refusing to honor the Warranties, and selling replacement parts to Plaintiffs and the Class members.

168. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiff and the Class members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

169. Plaintiff and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

170. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and monies from Plaintiff and Class members rightfully belonging to them.

171. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from its wrongful conduct.

172. As a result of the Defendants' unjust enrichment, Plaintiff and Class members have suffered damages.

173. Plaintiff and Class members have no adequate remedy at law for this claim. Plaintiff pleads this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

174. Plaintiff and Class members do not have an adequate remedy at law because damages alone will not remedy the Battery Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to Class Vehicles. Damages will only address past injuries visited on Plaintiffs and Class members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiffs and Class members wish to purchase

Defendants' vehicles in the future, but without such remedies Plaintiffs and Class members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

175. Plaintiffs and Class members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below-namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiffs and Class members, equitable restitution is appropriate and Plaintiffs plead it in the alternative to any available legal remedies.

176. Alternatively, legal remedies available to Plaintiffs and Class members are "inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief due to significant differences in proof." *See Ramirez v. S. Martinelli & Co.,* 25-CV-7569, 2026 WL 272621, at *4-5 (N.D. Cal. Feb. 2, 2026) (quotations omitted).

177. Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with a replacement components that do not contain the defects alleged herein;

and/or compelling Defendants to reform their warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT IV

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 ("UCL")
### On behalf of Plaintiffs Rodrick, Akel, Sica, and the California Subclass

178. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

179. Plaintiffs Rodrick, Akel, and Sica bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendants.

180. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

181. Defendants have engaged in unfair competition and unfair, unlawful, or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing the Defect from Plaintiffs Rodrick, Akel, and Sica and other California Subclass members. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs Rodrick, Akel, and Sica and California Subclass members could not have been reasonably expected to learn or discover these true facts.

182. The Battery Defect constitutes a safety issue for automobile owners, drivers, and passengers, thus requiring Defendants to disclose its existence to past and future owners and lessees.

183. By its acts and practices, Defendants have deceived Plaintiffs Rodrick, Akel, and Sica and are likely to have deceived the public. In failing to disclose the Battery Defect and suppressing other material facts, Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs Rodrick, Akel, and Sica and the California Subclass members. Defendants' omissions and acts of concealment pertained to information material to Plaintiffs Rodrick, Akel, and Sica and other California Subclass members, as it would have been to all reasonable consumers.

184. The injuries Plaintiffs Rodrick, Akel, and Sica and the California Subclass members suffered outweigh any potential countervailing benefit to consumers or to competition, and they are not injuries that Plaintiffs Rodrick, Akel, and Sica and the California Subclass members could or should have reasonably avoided.

185. Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

186. Plaintiffs and California Subclass members have no adequate remedy at law for this claim. Plaintiffs plead this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

187. Plaintiffs and California Subclass members do not have an adequate remedy at law because damages alone will not remedy the Battery Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to California Class Vehicles. Damages will only address past injuries visited on Plaintiffs and California Subclass members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiffs and California Subclass members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiffs and California Subclass members could not trust that

Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

188. Plaintiffs and California Subclass members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below-namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiffs and California Subclass members, equitable restitution is appropriate and Plaintiffs plead it in the alternative to any available legal remedies.

189. The scope of equitable relief available under the UCL is broader than what damages alone can provide. Unlike damages, which are constrained by traditional legal principles, the Court's discretion in fashioning equitable relief is expansive and can be tailored to the specific nature of the harm and the defendant's conduct. *Freeman v. Indochina Apparel, Inc.*, 443 F. Supp. 3d 1107, 1113 (N.D. Cal. 2020); Cortez, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal considerations associated with damages would not. Restitution under the UCL can be awarded even absent individualized proof of harm, even in favor of absent class members, and even in circumstances where a damages award would require offsetting the value of services received. *See, e.g., Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that

the claimant lacked knowledge of the overcharge when the transaction occurred."); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 661 (1993) ("In a suit arising under Business and Professions Code section 17200 et seq., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'"); *Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (4th Dist. 2007), *as modified* (Apr. 24, 2007) (restitution is available even in situations where damages may not be). These features of equitable restitution make it a meaningfully different and more complete remedy than damages, confirming that legal remedies alone are inadequate to fully redress the injuries at issue here.

190. Alternatively, legal remedies available to Plaintiffs and California Subclass members are "inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief due to significant differences in proof." *See Ramirez v. S. Martinelli & Co.*, 25-CV-7569, 2026 WL 272621, at *4-5 (N.D. Cal. Feb. 2, 2026) (quotations omitted).

191. Plaintiffs Rodrick, Akel, and Sica seek to enjoin Defendants from further unlawful, unfair, and/or fraudulent acts or practices, to obtain restitutionary disgorgement of all monies and revenues Defendants have generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**COUNT V**

**VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**Cal. Civ. Code § 1750, *et seq.***
**(On behalf of Plaintiffs Rodrick, Akel, and Sica and the California Subclass)**

192. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

193. Plaintiffs Rodrick, Akel, and Sica bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendants.

194. Defendants are "persons" as that term is defined in California Civil Code § 1761(c).

195. Plaintiffs Rodrick, Akel, and Sica and the California Subclass members are "consumers" as that term is defined in California Civil Code §1761(d).

196. Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs Rodrick, Akel, and Sica and California Subclass members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem).

197. Defendants' acts and practices violated the CLRA by: (i) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have; (ii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (iii) Advertising goods and services with the intent not to sell them as advertised; and (iv) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

198. Defendants' unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

199. Defendants knew that the 12-volt batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

200. Defendants had a duty to Plaintiffs Rodrick, Akel, and Sica and the California Subclass members to disclose the Defect and the defective nature of the Class Vehicles because:

A. Defendant was in a superior position to know the true state of facts about the Battery Defect and its associated costs;

B. Plaintiffs Rodrick, Akel, and Sica and the California Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had the Battery Defect until the defect became manifest;

C. Defendants knew that Plaintiffs Rodrick, Akel, and Sica and the California Subclass members could not reasonably have been expected to learn about or discover the Battery Defect and the effect it would have on the Class Vehicles' operability until after their points of sale when the defect became manifest.

201. In failing to disclose the Defect, Defendants have knowingly and intentionally concealed material facts and breached its duty to disclose.

202. The facts Defendants concealed or did not disclose to Plaintiffs Rodrick, Akel, and Sica and the California Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiffs Rodrick, Akel, and Sica and the California Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

203. Plaintiffs Rodrick, Akel, and Sica provided Defendants with notice of their CLRA violations on August 10, 2026 and currently seek injunctive relief. Plaintiffs

Rodrick, Akel, and Sica hereby reserve their right to amend this Complaint to seek monetary damages under the CLRA after the 30-day notice period expires.

204. Plaintiffs and California Subclass members have no adequate remedy at law for this claim. Plaintiffs plead this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

205. Plaintiffs and California Subclass members do not have an adequate remedy at law because damages alone will not remedy the Battery Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to Class Vehicles. Damages will only address past injuries visited on Plaintiff and Class Members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiff and Class Members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiff and Class Members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

206. Plaintiffs and Class members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below-namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and hat restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiffs and Class members, equitable restitution is appropriate and Plaintiffs plead it in the alternative to any available legal remedies.

207. Alternatively, legal remedies available to Plaintiffs and Class members are "inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief due to significant differences in proof." *See Ramirez v. S. Martinelli & Co.,* 25-CV-7569, 2026 WL 272621, at *4-5 (N.D. Cal. Feb. 2, 2026) (quotations omitted).

208. Defendants' fraudulent and deceptive business practices proximately caused injuries to Plaintiffs Rodrick, Akel, and Sica and the members of the California Subclass.

209. Pursuant to Cal. Civ. Code § 1780, Plaintiffs Rodrick, Akel, and Sica seek injunctive and declaratory relief and reasonable attorneys' fees and costs.

**COUNT VI**

**VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**Fla. Stat. § 501.201, *et seq*.**
**(On behalf of Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass)**

210. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

211. Plaintiffs Doyle, Samuel, and Werstil bring this claim on behalf of themselves and on behalf of the Florida Sublass against Defendants.

212. Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass members are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") § 501.203(7).

213. Defendants engaged in "trade or commerce" within the meaning of FDUTPA § 501.203(8).

214. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …." Fla. Stat. § 501.204(1). By concealing the Defect in the Class Vehicles,

Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

215. Defendants violated the FDUTPA by engaging in the practices described above, and by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles.

216. Defendants had the duty to Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass members to disclose the Defect and the defective nature of the Class Vehicles and to refrain from unfair or deceptive practices under the FDUTPA because (a) Defendants were in a superior position to know the true state of facts about the Defect and its associated costs; (b) Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest; and (c) Defendants knew that Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass members could not reasonably have been expected to learn about or discover the Defect and the effect it would have on the Class Vehicles' operability.

217. In failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty to disclose.

218. By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose the Defect and the defective nature of the Class Vehicles, Defendants engaged in the exact type of unfair or deceptive acts and practices prohibited by the FDUTPA because they used deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

219. The facts Defendants concealed or did not disclose to Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase

the Class Vehicles or pay a lesser price. Had Plaintiffs Doyle, Samuel, and Werstil and the Florida Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

220. Plaintiffs Doyle, Samuel, and Werstil and Florida Subclass members suffered ascertainable losses and actual damages through their overpayment at the time of purchase and lease for Class Vehicles with an undisclosed Defect as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

221. Defendants' violations present a continuing risk to Plaintiffs Doyle, Samuel, and Werstil and Florida Subclass members, as well as the general public, because the Class Vehicles remain unsafe due to the Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

222. Plaintiffs Doyle, Samuel, and Werstil and Florida Subclass members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the FDUTPA.

## COUNT VII

### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")
### (On behalf of Plaintiffs Pabilonia and McRae and the New Jersey Subclass)

223. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

224. Plaintiffs Pabilonia and McRae bring this claim on behalf of themselves and on behalf of the members of the New Jersey Subclass against Defendants.

225. Defendants are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

226. The Class Vehicles are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

227. Defendants violated the NJCFA by engaging in the practices described above, and by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles.

228. Defendants had the duty to Plaintiffs Pabilonia and McRae and New Jersey Subclass members to disclose the Defect and the defective nature of the Class Vehicles and to refrain from unfair or deceptive practices under the NJCFA because (a) Defendants were in a superior position to know the true state of facts about the Defect and its associated costs; (b) Plaintiffs Pabilonia and McRae and New Jersey Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest; and (c) Defendants knew that Plaintiffs Pabilonia and McRae and New Jersey Subclass members could not reasonably have been expected to learn about or discover the Defect and the effect it would have on the Class Vehicles' operability.

229. In failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty to disclose.

230. By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose the Defect and the defective nature of the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

231. The facts Defendants concealed or did not disclose to Plaintiffs Pabilonia and McRae and New Jersey Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiffs Pabilonia and McRae and New Jersey Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

232. Plaintiffs Pabilonia and McRae and New Jersey Subclass members suffered ascertainable losses and actual damages through their overpayment at the time of purchase and lease for Class Vehicles with an undisclosed Defect as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

233. Defendants' violations present a continuing risk to Plaintiffs Pabilonia and McRae and New Jersey Subclass members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

234. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs Pabilonia and McRae and New Jersey Subclass members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the NJCFA.

## COUNT VIII

**VIOLATION OF HAWAII UNFAIR OR DECEPTIVE ACTS AND PRACTICES STATUTE**
**HRS § 480-1, *et seq.* ("UDAP")**
**(On behalf of Plaintiff Dade and the Hawaii Subclass)**

235. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

236. Plaintiff Dade brings this claim on behalf of himself and on behalf of the members of the Hawaii Subclass against Defendants.

237. Defendants are "persons" within the meaning of HRS § 480-1.

238. The Class Vehicles are "commodities" within the meaning of HRS § 480-1.

239. Defendants violated the UDAP by engaging in the practices described above, and by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles.

240. Defendants had the duty to Plaintiff Dade and Hawaii Subclass members to disclose the Defect and the defective nature of the Class Vehicles and to refrain from unfair or deceptive practices under the UDAP because (a) Defendants were in a superior position to know the true state of facts about the Defect and its associated costs; (b) Plaintiff Dade and Hawaii Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest; and (c) Defendants knew that Plaintiff Dade and Hawaii Subclass members could not reasonably have been expected to learn about or discover the Defect and the effect it would have on the Class Vehicles' operability.

241. In failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty to disclose.

242. By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose the Defect and the defective nature of the Class Vehicles, Defendants engaged in the exact type of unfair or deceptive acts and practices prohibited by HRS § 480-2 because they used deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

243. The facts Defendants concealed or did not disclose to Plaintiff Dade and Hawaii Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Dade and Hawaii Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

244. Plaintiff Dade and Hawaii Subclass members suffered ascertainable losses and actual damages through their overpayment at the time of purchase and lease for Class Vehicles with an undisclosed Defect as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

245. Defendants' violations present a continuing risk to Plaintiff Dade and Hawaii Subclass members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

246. Pursuant to HRS § 480-13, Plaintiff Dade and Hawaii Subclass members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the UDAP.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and each of the Subclasses, pray that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B. Appoint Plaintiffs as representatives of the Nationwide Class and/or the applicable State Subclasses and their counsel as Class Counsel;

C. Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class members are entitled;

D. Award pre- and post-judgment interest on any monetary relief;

E. Grant appropriate injunctive relief against all Defendants, including an order requiring Defendants to permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F. Determine that Defendants are financially responsible for all Class notice and administration of Class relief;

G. Award reasonable attorney fees and costs; and

H. Grant such further relief that this Court deems appropriate.

## X. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED this 10TH DAY OF AUGUST, 2026.

*/s/ Gayle M. Blatt*

Gayle M. Blatt (SBN # 122048)
P. Camille Guerra (SBN # 326546)
**CASEY GERRY FRANCAVILLA BLATT LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
gmb@cglaw.com
camille@cglaw.com

Jonathan Shub (CSB # 237708)
Benjamin F. Johns (*pro hac vice pending*)
Samantha E. Holbrook (*pro hac vice forthcoming*)
Deirdre R. Mulligan (*pro hac vice forthcoming*)
**SHUB JOHNS & HOLBROOK LLP**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com
dmulligan@shublawyers.com

E. Powell Miller
Dennis A. Lienhardt (admitted *pro hac vice)*
Dana E. Fraser
**THE MILLER LAW FIRM P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

Ethan D. Roman (admitted *pro hac vice*)

**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (914) 775-8862
edr@wittelslaw.com

*Counsel for Plaintiffs*